Sarah A. Matsumoto, OSB # 111235
Sarah.Matsumoto@colorado.edu
University of Colorado Law School
Natural Resources, Energy, and Environmental Law Clinic
2450 Kittredge Loop Road
Boulder, CO 80309
(206) 351-5515

*Attorney for Plaintiff Applegate Siskiyou Alliance*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **APPLEGATE SISKIYOU ALLIANCE**, a domestic non-profit corporation, | Case No.: 1-23-cv-01163 |
| Plaintiff, | |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, a government agency, | Environmental Matters – Violations of Federal Land Policy and Management Act (43 U.S.C. § 1701 *et seq*.); National Environmental Policy Act (42 U.S.C. § 4321 *et seq*.); Administrative Procedure Act (5 U.S.C. § 551 *et seq*.) |
| Defendant. | |

Complaint for Declaratory and Injunctive Relief

## INTRODUCTION

1.      Plaintiff Applegate Siskiyou Alliance ("ASA") challenges the Bureau of Land Management's ("BLM") approval of the Integrated Vegetation Management for Resilient Lands Program ("IVM-RL Program") and issuance of associated documents, including the Finding of No Significant Impact ("FONSI") for the program, the "Decision Record" ("DR"), and the Determination of NEPA Adequacy ("DNA") for the Late Mungers Integrated Vegetation Management Project ("Late Mungers"). In approving and issuing the foregoing, BLM acted arbitrarily and capriciously, and contrary to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, the Federal Land Policy and Management Act ("FLPMA") 43 U.S.C § 1701 *et seq* and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

2.      ASA is concerned that the IVM-RL Program fails to comply with a number of substantive and procedural requirements, but has focused this legal challenge and requested relief on those aspects of the decision that allow intensive timber harvest in Special and Extensive Recreational Management Areas, in Late Successional Reserves, and other older, complex forests. This legal challenge and request for relief also focuses on BLM's chosen "programmatic" approach in the IVM-RL Program's Environmental Assessment ("EA"), which affects ASA's and other members of the public's ability to be fully informed about the specific agency actions on which they are entitled to comment and their ability to meaningfully participate in the planning process.

3.      The DR approved the use of DNAs for subsequent, "site-specific" timber sales and "vegetation management projects" and other activities. The first of those site-specific projects, the Late Mungers Project, implements the commercial timber sale and "vegetation management" activities described in and authorized by the IVM-RL Program's EA.

Complaint for Declaratory and Injunctive Relief                                                    1

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 551 *et seq*. (Administrative Procedure Act), including under 5 U.S.C. §§ 702-706, because the action arises under the laws of the United States and there is a present and actual controversy between the parties.

5.      ASA has exhausted its administrative remedies by participating in the IVM-RL and Late Mungers DNA development processes. ASA has submitted multiple written comments, and its executive director and members and supporters have attended field trips and provided oral comments at multiple stages of the IVM-RL process and in the very minimal Late Mungers process.

6.      The actions challenged herein are subject to judicial review by this Court pursuant to 5 U.S.C. §§ 702-706.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(e) because BLM's Medford office is located within this judicial district and because the geographic area subject to the IVM-RL Program is located within this judicial district.

8.      The Medford District is the proper "divisional venue" pursuant to Local Rule 3-2. BLM's Medford office is located in Jackson County, and the Late Mungers project is located in Josephine County. LR 3-2(a)(4). Accordingly, "a substantial part of the events or omissions giving rise to the claim[s]" occurred in and a "substantial part of the property that is the subject of the action" is situated in the Medford Division.

## PARTIES

9.      Plaintiff APPLEGATE SISKIYOU ALLIANCE ("ASA") is an Oregon nonprofit and 501(c)(3) conservation and community organization based in Jacksonville, Oregon and the

Applegate Valley. ASA's members include Applegate Valley residents and businesses working to sustain the integrity of the environment and human communities in the Applegate Valley and surrounding areas through education, collaboration, community activism, stewardship, and science. ASA promotes wildland conservation, ecological restoration, a sustainable rural economy, and community engagement in land management planning through a variety of activities and programs, including forest and environmental education programs, off-highway vehicle monitoring programs, and lands stewardship programs. To achieve its goals, ASA regularly comments on proposed agency rules and actions, participates in webinars, workshops, and agency field trips, and litigates, when necessary.

10.    ASA was formerly known as Applegate Neighborhood Network, and submitted written comments at multiple stages of development of the IVM-RL Program as Applegate Neighborhood Network.

11.    ASA has an organizational interest in the protection and preservation of the Applegate River watershed and surrounding public lands within the Applegate Valley, including all animal, insect, and plant species residing on or endemic to those lands, including, without limitation, species listed as threatened and endangered under the Endangered Species Act. ASA also has an organizational interest in fostering public engagement in the land management planning process and promoting sustainable outdoor recreation in the Mungers Butte Extensive Recreational Management Area, and other locations throughout the Applegate Valley and Siskiyou Mountains.

12.    ASA's members and supporters live or work in communities located near or adjacent to the Applegate River watershed and surrounding public lands within the Applegate Valley and the Siskiyou Mountains. ASA's members and supporters hold a deep connection with the Applegate

Valley's unique natural environment and with the incredible biodiversity of the Siskiyou Mountains. That connection is fostered through observing, studying, and protecting its habitat connectivity, scenic beauty, and ecological integrity, while regularly enjoying the area's beauty and building relationships with the public lands in question through outdoor recreation.

13.     BLM's proposed actions would deprive ASA and its members of the recreational, spiritual, professional, aesthetic, educational, and other benefits they presently derive from the biodiversity, habitat connectivity, scenic beauty, and ecological integrity of the Applegate Valley, the Applegate Watershed, and the Siskiyou Mountains they work to sustain. ASA and its supporters also have concrete plans to return to and continue recreating in and near the areas where the Late Mungers timber sale units are located and throughout the IVM-RL Program area.

14.     Additionally, BLM's actions deny ASA and its members their right to have the laws of the United States properly implemented and enforced, and the satisfaction and peace of mind associated with witnessing the enforcement of the nation's environmental protection laws. BLM's actions deny ASA and its members their right to meaningfully participate in environmental planning and decision-making processes to the degree contemplated by Congress in enacting the NEPA. These injuries are actual and concrete and would be redressed by the relief sought herein.

15.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an administrative agency within the U.S. Department of the Interior and is charged with the management of the Applegate Valley, the Applegate River Watershed, the Siskiyou Mountains, and the surrounding public lands. The BLM is also charged with complying with regulatory standards contemplated by Congress in enacting NEPA, FLPMA, and the Administrative Procedure Act. BLM issued the Integrated Vegetation Management for Resilient Lands EA,

Finding of No Significant Impact, and Decision Record from which the Late Mungers Project and the associated timber sales (Late Mungers Timber Sale and Penn Butte Timber Sale) were developed and authorized.

## LEGAL FRAMEWORK

### Administrative Procedure Act (APA)

16.    The Administrative Procedure Act (APA) confers a right of judicial review on any person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. 5 U.S.C. § 704.

17.    A reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be: arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with the law; in excess of statutory jurisdiction or short of a statutory right; or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

18.    An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a different in view or the product of agency expertise." *Motor Vehicle Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

### National Environmental Policy Act (NEPA)

19.    The Congressional purpose of the National Environmental Policy Act ("NEPA") is, in relevant part, to "encourage productive and enjoyable harmony between man and his

environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation[.]" 42 U.S.C. § 4321.

20.    To accomplish this purpose, NEPA is designed to (1) ensure agencies, like the BLM, take a "hard look" at the consequences of their proposed actions by requiring that "the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts[,]" and (2) ensure that the relevant information will be available to the public who may also "play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

21.    Established pursuant to NEPA, the Council on Environmental Quality ("CEQ") is housed within the Executive Office of the President and is tasked with promoting the improvement of the quality of the environment. 42 U.S.C. § 4342. Like all federal agencies, BLM must comply with regulations from CEQ as well as its own internal rules.[1] 40 C.F.R. §§ 1500 (1978).

22.    To comply with NEPA, agencies must fully disclose all of the potential adverse environmental effects of their decisions before making a decision about whether, and how, to proceed. 42 U.S.C. § 4332(C).

23.    NEPA requires federal agencies to complete a detailed Environmental Impact Statement (EIS) "on major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C), 40 C.F.R. § 1508.1(j) (1978).

---

[1] NEPA's longstanding implementing regulations were amended in 2020. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). Because the IVM-RL project was initiated in July of 2019, it is subject to the 1978 CEQ NEPA regulations; those regulations are cited herein.

Complaint for Declaratory and Injunctive Relief                                                     6

24.    "Major federal actions" include adoption of plans upon which future agency actions will be based. 40 C.F.R. § 1508.18 (1978).

25.    Whether a federal action is significant depends on context and intensity. 40 C.F.R. § 1508.27 (1978).

26.    When determining whether an action is significant in context, the agency must consider impacts based on the affected region, affected interests, and affected locality. 40 C.F.R. § 1508.27(a) (1978).

27.    When determining whether an action is significant in intensity, the agency must consider ten non-exhaustive factors, including, (1) impacts that may be both beneficial and adverse, (2) the degree to which the proposed action affects public health or safety, (3) unique characteristics of the geographic area, such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas, (4) the degree to which the effects on the quality of the human environment are likely to be highly controversial, (5) the degree to which the possible effects on the environment involve unique or unknown risks or are highly uncertain, (6) the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration, (7) whether the action is related to other actions with individually insignificant but cumulatively significant impacts, (8) the degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources, (9) the degree to which the action may adversely affect an endangered or threatened species or its critical habitat, and (10) whether the action threatens a violation of federal, state, or local law or

requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b)(1)-(10) (1978).

28.    An agency is prohibited from avoiding significance by breaking down the action into smaller components. 40 C.F.R. § 1508.28(b)(7).

29.    When one NEPA intensity factor alone raises substantial questions as to whether an action will have a significant environmental effect, an EIS is warranted. *Bark v. United States Forest Serv.,* 958 F.3d 865, 871 (9th Cir. 2020).

30.    The EIS must include discussion on "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C).

31.    If an agency, such as the BLM, decides not to issue an EIS, it must provide a convincing statement of reasons why the project will not significantly affect the environment. *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 864 (9th Cir. 2005).

32.    The agency may prepare an Environmental Assessment ("EA") if it is uncertain whether a proposed action will have a significant effect on the human environment. 40 C.F.R. § 1501.4 (1978).

33.    If there is a substantial question whether an action "may have a significant effect" on the environment, then the agency must prepare an Environmental Impact Statement (EIS). *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008).

34.    A plaintiff challenging the adequacy of an agency's NEPA process is not required to show that significant effects will in fact occur rather, raising a substantial question whether a project may have a significant effect is sufficient. *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005) (quotations omitted).

35.    If an agency determines, based on analysis contained in the EA, that the proposed action will not significantly affect the environment, it issues a Finding of No Significant Impact ("FONSI"). A FONSI is a convincing statement of reasons to explain why the proposed action will not have a significant impact. 40 C.F.R. § 1508.13 (1978). Statements concluding that an impact is insignificant, without further analysis, are insufficient. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 879 (9th Cir. 2022) (citing *Ocean Advocs.* 402 F.3d at 864).

36.    Regardless of whether the agency decides to issue an EIS or EA, the agency is required to take a "hard look" at the proposed action by considering the direct and indirect effects and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7; 1508.8.

37.    Direct effects are caused by the action and occur at the same time and place of the action. 40 C.F.R. § 1508.8(a). Indirect effects are reasonably foreseeable impacts that are caused by the action and occur at a farther removed distance or later time. 40 C.F.R. § 1508.8(b).

38.    Cumulative impacts are impacts resulting from the "incremental impact of the action when added to past, present, and reasonably foreseeable future actions regardless of what agency … or person undertakes such other actions." 40 C.F.R. § 1508.7.

39.    A "programmatic" EIS reflects broad environmental consequences attendant upon a wide-ranging federal program.

Complaint for Declaratory and Injunctive Relief                                    9

40.     An agency must conduct a site-specific analysis of the proposed action and its effects when implementing projects proposed in the programmatic review. A general overview of possible effects over a broad planning area is not sufficiently detailed at the project level.

41.     In cases where a broad project analysis identifies but does not provide sufficiently in-depth analysis for potential future actions, then subsequent analyses are appropriate and are referred to as "tiered" analyses. 40 C.F.R. § 1508.28.

42.     "Tiering" refers to the coverage of general matters in a broader EIS with subsequent narrower statements or environmental analyses incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. 40 C.F.R. § 1508.28.

43.     Courts review tiered analyses as a whole when determining whether they adequately address significant impacts, and may reject subsequent NEPA analysis if a significant or new issue is not fully considered in either document.

44.     After approving "programmatic" level decisions, a Determination of NEPA Adequacy ("DNA") may be used in place of an EA or EIS for subsequent implementing analysis. DNAs only confirm that an action conforms to the approved land use and is adequately analyzed in an existing tiered NEPA document.

45.     DNAs are not themselves NEPA documents, and do not contain the environmental analysis required by NEPA.

46.     A DNA cannot compensate for an earlier, inadequate NEPA document.

47.     On December 18th, 2014, CEQ published its final guidance for the effective use of programmatic NEPA reviews in the "CEQ Memorandum for Heads of Federal Departments and Agencies" as a response to requests for additional guidance on programmatic review, and

because "the programmatic approach under NEPA has not been fully used for its intended purpose and when used, it often has not fulfilled agency or stakeholder expectations." CEQ Memorandum for Heads of Federal Departments and Agencies.

### Federal Land Policy and Management Act (FLPMA)

48.    The Federal Land Policy and Management Act (FLPMA) requires BLM to develop land use plans identified officially as "resource management plans" (RMPs). These plans are intended to further the national policy to "protect the quality of scientific, scenic, historical, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

49.    Following approval of a RMP, BLM is required to manage its lands and ensure that site specific actions comply with and are clearly consistent with the management directives and land use allocations identified in that plan. 43 U.S.C §1732 (a); 43 C.F.R. § 1610.0-5(b).

50.    Once a RMP is approved, it may be "maintained" as necessary to reflect minor changes in data. 43 C.F.R. § 1610.5-4. RMP "maintenance" is not considered a plan amendment, and may not result in "expansion in the scope of resource uses or restrictions, or change the terms, conditions, and decisions of the approved plan." *Id*.

### FACTUAL BACKGROUND

### Geographic Area and Regional Management Plan

51.    The Southwestern Oregon region is largely rural, with varied terrain and ecosystems. Features of the region include the Applegate Watershed, the Eastern Siskiyou Mountains, and the Siskiyou Crest. Present in the region are high levels of biodiversity and habitat diversity, including low foothills, valleys, arid grasslands, oak woodlands, dense chaparral, mixed conifer forests, and high rocky peaks.

Complaint for Declaratory and Injunctive Relief                                          11

52.    The Siskiyou Crest is a regionally significant connectivity corridor and the only transverse range in the Pacific Northwest linking the Cascade Mountains to the Coast Range. It is also at the convergence of the Pacific Northwest, the California Floristic Province, and the arid Great Basin, and contains some of the world's most diverse conifer forests.

53.    The IVM-RL Program project area extends across the Siskiyou Mountains and portions of the Cascade Mountains in southern Oregon, while the Late Mungers Project is located in the Applegate River watershed at the eastern end of the Siskiyou Crest range.

54.    The Applegate River watershed and Applegate Valley area are also home to a number of small rural communities, farms, vineyards, rural residential areas, and plant and animal species, while the larger southwestern Oregon area contains towns, urban areas, farms, and larger residential populations, as well as habitat for plant and animal species. Communities, recreational opportunities, watersheds, wildlife and habitats throughout southwestern Oregon would be affected by implementation of the IVM-RL Program and the Late Mungers Project.

55.    Much of the land in the region is managed by BLM. BLM's Medford District encompasses 876,009 acres.

56.    The 2016 Southwestern Oregon Resource Management Plan ("2016 RMP") dictates management directions for different lands in the region, including lands contained within the IVM-RL Program area. Under the 2016 RMP, BLM's approach to management differs with different land use allocations. The 2016 RMP includes the following land use allocations: Late Successional Reserve, Recreational Management Areas and Harvest Land Base.

57.    Objectives for the Late Successional Reserve allocations include protecting stands of older, complex conifer forest, maintaining habitat for certain species, including northern spotted

owl ("NSO") and marbled murrelet, and developing habitat for the NSO in stands that are not currently suitable for habitat.

58.     To meet these objectives, the 2016 RMP mandates certain requirements, including that 1) all stands currently serving as nesting and roosting habitat for NSO are maintained regardless of occupancy, and 2) any silvicultural treatments do not preclude or delay development of NSO nesting and roosting habitat by 20 years or more when compared to no treatment.

59.     The 2016 RMP designated Special Recreation Management Areas (SRMAs) and Extensive Recreation Management Areas (ERMAs) establishing recreation and visitor service objectives for spatially explicit portions of the landscape. The 2016 RMP also identified management actions and allowable uses within these areas, and requires management actions to be consistent with the individualized recreational planning frameworks.

60.     Extensive Recreation Management Area allocations are defined in the 2016 RMP as "administrative units that require specific management consideration in order to address recreation use, demand, or recreation and visitor services program investments. The BLM manages ERMAs to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMAs is commensurate with the management of other resources and resource uses."

61.     The Medford District's Recreation Management Area Framework for the Mungers Butte ERMA ("Mungers Butte ERMA Framework") describes it as an 11,873-acre area with "potential for trail development in an area close to urban centers."

62.     The Mungers Butte ERMA Framework identifies the area's proposed recreation setting characteristics designation as "Middle Country."

63.    The Mungers Butte ERMA Framework sets forth specific forest management actions and allowable use restrictions for this ERMA. Fuel treatments, commercial logging and other vegetation modifications are allowable only if they are compatible with meeting recreation objectives, do not interfere with recreation opportunities, and maintain setting characteristics.

64.    To date, BLM has designated the Mungers Butte ERMA and has identified a need for federal timber and vegetation management activities to be "compatible with meeting recreation objectives," but has not created a management plan or identified trails, developed recreational sites, or other identified potential recreational developments or infrastructure appropriate for the area.

65.    The 2016 RMP lacks site-specific analysis of logging and vegetation management impacts in the geographic area and land use allocations covered in the IVM-RL EA or Late Mungers DNA.

**The IVM-RL Program**

66.    On July 3, 2019, BLM issued a "scoping notice" for the IVM-RL Program EA. The notice described how certain "vegetation treatments" are necessary to achieve the objectives of the 2016 RMP.

67.    On July 31, 2019, ASA (f/k/a Applegate Neighborhood Network) submitted scoping comments to BLM. Those comments raised many concerns, including, but not limited to, the scope and scale of activities and geographic area potentially covered by BLM's proposed programmatic approach, potentially adverse effects on NSO, gray wolves, fisheries, plant communities and other species, the potential for forest "restoration" programs to lead to overlogging and additional commercial timber sales, and other concerns about degradation, impacts of logging on recreation, and fire risk. The comments also expressed concern that the

use of DNAs could allow BLM to avoid site-specific analysis, limit the public's role, and could "reduce transparency, accountability, and even public disclosure[,]" and "reduc[e] the effectiveness of public land management activities."

68.    BLM published drafts of Chapters 1 and 2 of the IVM-RL EA on October 29, 2019.

69.    On November 17, 2019, ASA submitted comments on Chapters 1 and 2 of the IVM-RL EA. In its comments, ASA reiterated and expanded upon many of its earlier concerns and raised additional points for BLM's consideration. Among other requests, ASA urged BLM to analyze impacts to specific recreational opportunities in the Mungers Butte ERMA and to holistically analyze carbon emissions and impacts of the project on climate change. ASA expressed a preference for Amended Alternative A while pointing out concerns with some of BLM's other proposed alternatives. ASA urged BLM to reconsider the scale and scope of its programmatic approach, stressed the need for site-specific analysis and public involvement for each stage and aspect of the IVM-RL Program, and recommended that BLM complete a full Environmental Impact Statement (EIS) for the IVM-RL Program because "substantial questions have been raised regarding the effects of the IVM Project[.]"

70.    On August 19, 2020, BLM published the complete IVM-RL Draft Environmental Assessment and associated draft Finding of No Significant Impact.

71.    On October 16, 2020, ASA submitted comments on the complete IVM-RL Draft Environmental Assessment. ASA's detailed comments elaborated on earlier concerns and identified new issues. Once again, ASA explained the need for BLM to adequately consider Recreation Management Areas and the compatibility of the IVM-RL Project with the applicable planning frameworks. ASA emphasized its strong opposition to Alternatives C & D, and stressed

that "the public's right to participate meaningfully in federal land management planning should not be further limited or eliminated by Programmatic NEPA analysis."

72.    On March 2, 2022, BLM published the final IVM-RL Environmental Assessment, approved a Finding of No Significant Impact, and issued a Programmatic Decision Record.

73.    BLM did not prepare an Environmental Impact Statement for the IVM-RL Program.

74.    The Decision Record, supported by the IVM-RL Environmental Assessment, authorizes up to ten years of future vegetation management activities within 684,185 acres of land within BLM's Medford District.

75.    Specifically, the Decision Record authorizes:

    a.   commercial thinning and selection harvest,

    b.   an annual maximum of 4,000 acres of commercial logging and a ten-year maximum of 20,000 acres of commercial logging (17,000 of which is within Late Successional Reserve),

    c.   an annual maximum of 6,500 acres of small-diameter thinning and a ten-year maximum of 60,000 acres of small-diameter thinning,

    d.   an annual maximum of 7,500 acres of prescribed fire and a ten-year maximum of 70,000 acres of prescribed fire,

    e.   Ten miles of temporary road construction annually, and up to 90 miles of construction over ten years.

76.    The Decision Record also states that "take," as defined under the Endangered Species Act, of NSO territorial pairs or resident single owls would not occur. Yet, BLM provides no site-specific detail for how it intends to avoid "take" even though it will be approving and

implementing treatments that will downgrade or remove many acres of Northern Spotted Owl habitat and prevent the development of many others.

77.    Logging treatments identified as Ecosystem Resilience-Open and Ecosystem Resilience-Intermediate in the IVM-RL Program EA will remove habitat elements and reduce canopy cover below the 40% threshold for dispersal and 60% threshold for nesting, roosting and foraging habitat, leading to the removal of habitat of the NSO. These treatments will downgrade and remove habitat on an undisclosed number of acres within the 20,000 acre per decade of commercial harvest authorizations in the IVM-RL EA and Decision Record. This is largely because no limits have been placed on how many acres of Ecosystem Resilience-Open and Ecosystem Resilience-Intermediate can be implemented.

78.    BLM also authorized for implementation an undisclosed number of acres within the 17,000 acres of commercial harvest allowed in LSR forest. This is because no limitations have been placed on the implementation of Ecosystem Resilience-Open and Ecosystem Resilience-Intermediate prescriptions in LSR forests under the IVM-RL Program DR.

79.    The IVM-RL EA relies on NEPA analysis from the 2016 RMP for the disclosure and analysis of certain types of effects; the EA does not contain full analyses of those effects.

80.    The IVM-RL EA's selected alternative, Alternative C, includes a series of potential, future site-specific projects, like the Penn Butte and Late Mungers Projects, that could take place over ten years. Alternative C, the selected alternative, also includes the highest level and intensity of timber harvest and the most temporary road construction of all alternatives identified in the IVM-RL EA, having the largest possible impact on both LSR forest and designated Recreation Management Areas (SRMAs & ERMAs). It also includes commercial logging

Complaint for Declaratory and Injunctive Relief                                                                17

prescriptions that are nearly identical to prescriptions identified in the Harvest Land Base, despite very different management directives and desired conditions.

| Metric | IVM Project * | Harvest Land Base** |
|---|---|---|
| Upper Diameter Limit | > 36" DBH for conifers<br>> 24" DBH for hardwoods | ≥ 36" DBH for conifers<br>> 24" DBH for hardwoods |
| Age Limit for Tree Removal | Established prior to 1850 | Established prior to 1850 |
| Relative Density Target | 20%-45% Relative Density | 20%-45% Relative Density |
| Canopy Cover Retention | ≥ 30% minimum average stand canopy cover | N/A |
| Size of Group Selection "Openings" | Up to 4 acres in size (2.5 acres in stands < 10 acres) | Up to 4 acres in size (2.5 acres in stands > 10 acres) |
| Frequency of Group Selection "Openings" | Up to 20% of a stand in LSR | Up to 30% of a stand |
| Variable Sized Skips | Minimum 10% of stand in LSR | Minimum 10% of stand |
| Riparian Reserve Thinning | Retain ≥ 60 Trees Per Acre & ≥ 30% Canopy Cover in Outer & Middle Zone | Retain ≥ 60 Trees Per Acre & ≥ 30% Canopy Cover in Outer Zone |

*Based on Alternative C in the IVM Project Programmatic EA
** Based on Harvest Land Base, Uneven-Aged Timber Area (UTA)

81. In the Harvest Land Base, prescriptions are meant to maximize sustained yield timber production, while creating "single story stands and structural stages without structural legacies." The agency also admits that under Harvest Land Base prescriptions, "the abundance of structurally complex stands would not increase," and most forests would be intensively managed to create "equal parts of early successional, stand establishment, young, mature and structurally complex" forest habitat. In contrast, the 2016 RMP mandates an approach to LSR management that would "trend towards Mature and Structurally-complex conditions, while early Successional, Stand Establishment, and Young stands would mostly disappear over time."

82. Objectives in LSR forest must be focused on the retention or development of late successional forest habitats and the recovery of the NSO as a species. They also must not preclude or delay the development of those conditions for more than 20 years relative to untreated or unmanaged stands. Yet, the IVM-RL Program logging prescriptions are nearly identical to those approved in the 2016 RMP for the Harvest Land Base and these treatments

would both specifically delay or preclude the development of Late Successional habitat for far more than 20 years and would, by BLM's own admission, not trend towards Late Successional conditions with early successional, young, and stand establishment stages disappearing over time. In conflict with these management directives are prescriptions proposed in LSR forest that would downgrade, degrade and/or remove suitable NSO habitat and are intended specifically to create openings, canopy gaps, and early successional stages that are inconsistent with LSR management directives in the 2016 RMP.

83.    The IVM-RL EA does not include an analysis of whether its authorized logging activities will maintain setting characteristics, interfere with recreation opportunities, or meet recreation objectives within the Mungers Butte ERMA. It states that potential effects on recreational opportunities were addressed in the 2016 RMP to which the IVM-RL EA tiers.

84.    Late Mungers and other future projects would be based on the IVM-RL Decision Record. BLM claims that when it designs these to-be-determined future projects, it will "evaluate each project to determine if the project is adequately analyzed by the EA…and whether the project conforms to this programmatic Decision for this EA."

85.    BLM also stated that for subsequent projects, like Late Mungers, it will permit public involvement "subject to Authorized Officer discretion and based on project specific circumstances[.]"

86.    On April 28, 2022, BLM published a draft Late Mungers Integrated Vegetation Management Project Draft Determination of NEPA Adequacy, the first of BLM's "implementation-level" projects under the IVM-RL EA.

87.    On May 10, 2022, BLM hosted an online public webinar where certain members of the public were allowed up to three minutes to provide public comment. Only individuals who were

preapproved were able to speak or ask questions at the public webinar, and these individuals were automatically cut off mid-sentence when three minutes were exceeded. Additionally, BLM did not answer questions or respond directly to these three-minute oral comments or to feedback received during the online webinar.

88.    On May 14, 2022, BLM conducted a community field trip to an area within the Late Mungers Project Area that had been selected for commercial logging.

89.    On June 27, 2022, ASA submitted written comments on the draft Late Mungers DNA. ASA's comments raised numerous concerns, including that the Late Mungers project had been "tiered" to the IVM-RL EA and Decision Record even though the IVM-RL EA and Decision Record contained no site-specific analysis of the environmental conditions in and impacts on the Williams, Murphy, or Deer Creek watersheds.

90.    In its comments on the Late Mungers DNA, ASA reiterated its concern with the programmatic nature of the IVM-RL Program and the way that this structure precludes the public from fully reviewing and commenting on the site-specific impacts authorized under the Program. ASA expressed the difficulty in providing "substantive, site specific comments pertaining to the Late Mungers Vegetation Management Project" when BLM has "failed to provide meaningful information or credible, science-based environmental analysis to the public."

91.    ASA also reiterated its concern about impacts to the Mungers Butte Extensive Recreation Management Area, describing how the draft Late Mungers DNA—like the IVM-RL EA before it—failed to adequately analyze the impacts of commercial logging, road construction, landing construction, and other project activities on recreation and the Mungers Butte ERMA.

92.    ASA's comments on the draft Late Mungers DNA also noted, among other concerns, insufficient analysis and disclosure of impacts to habitat connectivity, inadequate detail around

threats to NSO and its habitat, failure to consider best available science in connection with fire and fuels, and inadequate consideration and analysis of impacts on downstream fisheries in Williams Creek watershed.

93.    On February 9, 2023, BLM issued the Decision Record and Final DNA for the Late Mungers timber sale ("Final Late Mungers DNA").

94.    The Final Late Mungers DNA authorizes 830 acres for commercial harvest, and allows up to 1.9 miles of temporary road construction.

95.    The Final Late Mungers DNA states that its proposed activities will not preclude or delay development of nesting and roosting habitat for the NSO by 20 years as compared to no treatment, but fails to include analysis and data to support this claim.

96.    The Final Late Mungers DNA and Decision Record contains no site-specific analysis of how the Late Mungers timber sale will maintain recreation setting characteristics, affect recreation opportunities, or meet recreation objectives within the Mungers Butte ERMA.

97.    In responding to public comment that the Late Mungers DNA did not analyze or disclose site-specific impacts of project activities on the Mungers Butte ERMA, BLM referred back to the IVM-RL EA, which, in turn, referred to the 2016 RMP.

## CLAIMS FOR RELIEF

### Violations of the Administrative Procedure Act, National Environmental Policy Act, and Federal Land Policy and Management Act

**First Claim for Relief: BLM violated NEPA when it failed to prepare an Environmental Impact Statement, and its Finding of No Significant Impact was arbitrary, capricious, and contrary to law.**

98.    ASA realleges and incorporates by reference all preceding paragraphs.

99.    BLM must prepare an EIS when a proposed major federal action may significantly affect the quality of the environment. 42 U.S.C. § 4332(C).

100.     Whether a proposed action is "significant" depends on context and intensity. 40 C.F.R. §
1508.27.

101.     To evaluate intensity, BLM is required to consider (among other factors) the degree to
which a proposed action's effects are likely to be highly controversial, the degree to which the
possible effects on the environment involve unique or unknown risks or are highly uncertain, the
degree to which the action represents a decision in principle about a future consideration, the
unique characteristics of the geographic area, the degree to which the action may adversely affect
an endangered or threatened species or its critical habitat, whether a cumulatively significant
impact on the environment is reasonably anticipated, and whether the proposed action threatens
to violate federal, state, or local law or other requirements imposed for environmental protection.
40 C.F.R. § 1508.27(b) (3)-(7), (9), (10) (1978).

102.     An EIS is warranted when one factor alone raises substantial questions as to whether an
action will have a significant environmental effect.

103.     The agency's decision not to issue an EIS must be well informed and accompanied by a
convincing statement of reasons showing that an action will not be significant. Statements
concluding that an impact is insignificant, without further analysis, are insufficient.

104.     BLM's IVM-RL Program is a major federal action that would have a significant impact
on the environment. Numerous intensity factors are present such that BLM must prepare an EIS.

105.     BLM's IVM-RL Program is highly controversial. The EA and Decision Record approve
treatments across a vast and varied geographic area over decade-long time period. Further, as
ASA expressed repeatedly throughout its comments, BLM's chosen programmatic approach for
a project of this size and scope renders public participation difficult, at best, and potentially
meaningless, at worst. The public's ability to participate fully in the NEPA process is frustrated

when the site-specific details of the IVM-RL Program's impacts and effects rests either in (1) the 2016 RMP, to which the IVM-RL EA tiers, or (2) to some as-yet-prepared DNA, which tiers to the IVM-RL EA and is not a true NEPA document. For example, the Final Late Mungers DNA directs commenters to the IVM-RL EA for analysis of impacts on recreation; the IVM-RL EA, in turn, directs commenters to the 2016 RMP or notes, in conclusory fashion, that no effects beyond those assessed in the 2016 RMP will occur.

106.    A substantial dispute exists regarding historic vegetation reference conditions, the effect of project activities on NSO habitats, the impact of the proposed logging on recreation, and whether logging will result in an increased resistance to disturbance events such as wildfire, drought, disease, insects, and climate change. The 2016 RMP, to which the IVM-RL EA purports to tier, recognizes the scientific controversy regarding these issues, yet the EA does little to address the substantial body of research highlighting the "considerable contrary scientific and expert opinion" cited in the RMP and scoping comments.

107.    The IVM-RL Program will affect areas with unique characteristics, including Areas of Critical Environmental Concern, Recreation Management Areas and mature and old-growth forests that provide habitat for ESA-listed species and other special status wildlife species.

108.    The IVM-RL Program will result in effects that involve unique or unknown risks because BLM failed to conduct site-specific analysis and the Program will span for at least ten years with no sunset date. The treatment area includes 684,185 acres of varying geologic conditions, topography, plant communities, habitat conditions, fire risks, and watersheds. Given the varying ecosystems of the project area, the uncertainty as to where the timber sales will occur, and the project's lengthy timeline, as-yet-unknown risks are inevitable.

109.     The IVM-RL Program establishes a precedent for future action and represents a decision in principle of a future consideration. The IVM-RL Program EA represents a decision in principle of future considerations because it sets out criteria for deciding whether a site-specific project conforms to the IVM-RL Program EA and whether further NEPA analysis is needed. The IVM-RL Program also establishes precedent for future action because if the agency decides that the site-specific project conforms to the IVM-RL Program EA, then the IVM-RL Program EA will be used for designing and implementing site-specific decisions without additional NEPA analysis.

110.     The IVM-RL Program will result in adverse impacts to endangered and threatened species, including the NSO, coastal marten, and marbled murrelet, and in adverse impacts to their habitat.

111.     The IVM-RL Program violates the Federal Land Policy and Management Act (FLPMA), as described herein.

112.     By authorizing and implementing the IVM-RL Program without preparing an EIS, BLM acted arbitrarily, capriciously, and in violation of NEPA. 5 U.S.C. § 706(2)(A).

**Second Claim for Relief: BLM failed to take a "hard look" at all direct and indirect effects and cumulative impacts of the IVM-RL Program and the Late Mungers timber sale.**

113.     ASA realleges and incorporates by reference all preceding paragraphs.

114.     Regardless of whether the agency decides to issue an EIS or EA, the agency is required to take a "hard look" at the proposed action by considering the direct and indirect effects and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7, 1508.8 (1978).

Complaint for Declaratory and Injunctive Relief                                                    24

115.    Direct effects are caused by the action and occur at the same time and place of the action. 40 C.F.R. § 1508.8(a) (1978). Indirect effects are reasonably foreseeable impacts that are caused by the action and occur at a farther removed distance or later time. 40 C.F.R. § 1508.8(b) (1978).

116.    Cumulative impacts are impacts resulting from the "incremental impact of the action when added to past, present, and reasonably foreseeable future actions regardless of what agency … or person undertakes such other actions." 40 C.F.R. § 1508.7 (1978). The agency may not break up a project into small component parts to avoid a finding of significance, as cumulative impacts can result from individually minor but collectively significant actions. *Id*.

117.    BLM failed to take the requisite "hard look" at all direct, indirect, and cumulative impacts likely to result from its authorization of the IVM-RL Program. In so doing, BLM failed to establish baseline conditions, improperly relied on unsupported assumptions and non-specific analyses in the 2016 RMP, and failed to consider impacts to the environment by setting aside any site-specific analysis until some vague time period in the future.

118.    In particular, BLM failed to take a "hard look" at the IVM-RL Program's effects and impacts on recreation, specifically on the Mungers Butte ERMA. Instead, project documents merely point to other, related documents: the Final Late Mungers DNA refers to the IVM-RL EA, the IVM-RL EA refers to the 2016 RMP.

119.    The 2016 RMP's Framework for the Mungers Butte ERMA describes its status as "Proposed for Development-Existing Use Occurring" and refers to future development of additional recreation facilities or features and an implementation level "Travel Management Plan[.]" Neither the Final Late Mungers DNA nor the IVM-RL EA disclose or analyze whether, and how, the authorized treatment activities affect the development of additional recreation facilities, a Travel Management Plan, or other recreational opportunities.

120.    The 2016 RMP—the highest "tier" of the multi-level tiered documents BLM references—lacks site-specific analysis of logging and vegetation management impacts in the geographic area and land use allocations covered in the IVM-RL EA and Late Mungers DNA, including the Mungers Butte ERMA.

121.    BLM's vague claims that it will conduct a non-mandatory, non-NEPA public input activity or process at some point in the future does not replace NEPA's requirement to take a "hard look" at all direct, indirect, and cumulative effects likely to result from the IVM-RL Program authorization and approval.

122.    BLM's failure to take a requisite "hard look" at all direct, indirect, and cumulative effects of the authorization and implementation of the IVM-RL Program violates NEPA and is arbitrary, capricious, and not in accord with the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

123.    BLM's conclusion that the Final Late Mungers DNA sufficiently assessed potential effects and that no further analysis was needed is arbitrary, capricious, and not in accord with the Administrative Procedure Act. 5 U.S.C. § 706(2)(A).

**Third Claim for Relief: BLM violated FLPMA when it authorized a program of work and implementing projects (including, but not limited to the Late Mungers Project) without ensuring those projects would be consistent with the 2016 RMP and Mungers Butte ERMA.**

124.    ASA realleges and incorporates by reference all preceding paragraphs.

125.    As described previously in this complaint, the 2016 RMP was developed to comply with FLPMA by implementing land use plans that will "protect the quality of scientific, scenic, historical, environmental, air, and atmosphere, water resources, and archeological values" 43 U.S.C. § 1701(A)(8).

126.    Following approval of an RMP, BLM is required to manage its lands and ensure that site specific project activities are in compliance with the management directives identified in that plan. 43 U.S.C §1732: 43 C.F.R § 1610.5-3(a).

127.    In the 2016 RMP for the Medford District BLM, two important land use allocations were designated within the Late Mungers Project Area, including Late Successional Reserve ("LSR") forest and the Mungers Butte ERMA. Both LSR forests and ERMAs are also found throughout the larger IVM-RL Planning Area.

128.    The 2016 RMP allocates LSR forest specifically to develop, maintain and promote northern spotted owl nesting, roosting and foraging habitat and Harvest Land Base ("HLB") where sustained yield timber harvest would occur. LSR areas are identified specifically to aid in the recovery of the northern spotted owl and its habitat throughout federal lands, rather than for timber production, and much of both the IVM-RL and Late Mungers Project areas are located within the LSR land use allocation.

129.    The 2016 RMP also designated Special and Extensive Recreation Management Areas intended to promote recreation and visitor services. These designations would apply to both the IVM-RL area as well as the Late Mungers Project, which contains the 11,837-acre Mungers Butte ERMA.

130.    To date, the BLM has designated the Mungers Butte ERMA and has identified a need for federal timber and vegetation management activities to be "compatible with meeting recreation objectives," but has not created a travel management plan or identified trails, developed recreational sites, or other identified potential recreational developments or infrastructure appropriate for the area.

131.    Without specific recreational opportunities identified by the BLM within this area, it is impossible for the agency to adequately address or consider the compatibility of the proposed Late Mungers Project and the associated timber sales with the recreational uses and opportunities provided within the Mungers Butte ERMA. This analysis is required by the 2016 RMP, but was not adequately conducted in the IVM-RL Program EA or the Late Mungers Project DNA.

132.    Accordingly, BLM failed to adequately ensure the consistency of project-level logging, road building, and vegetation removal proposed in the IVM-RL Program EA and in the Late Mungers Project with the allowable uses in the Mungers Butte ERMA and the 2016 RMP.

133.    BLM's decision to approve logging activities, road building, vegetation removal and other associated Program actions without ensuring compliance with the 2016 RMP and Mungers Butte ERMA violated FLPMA and is arbitrary, capricious, an abuse of discretion, and contrary to law. 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

Based on the foregoing, ASA respectfully requests that this Court:

A.    Declare that BLM violated NEPA and its implementing regulations by failing to prepare an Environmental Impact Statement for the Integrated Vegetation Management for Resilient Lands Program;

B.    Declare that BLM violated NEPA and its implementing regulations by failing to take the requisite "hard look" at all direct and indirect effects and cumulative impacts of the Integrated Vegetation Management for Resilient Lands Program and the Late Mungers Project;

C.    Declare that BLM violated FLPMA and its implementing regulations by approving the Integrated Vegetation Management for Resilient Lands Program Environmental Assessment and

associated Decision Record and Finding of No Significant Impact without ensuring those documents' consistency with the 2016 RMP;

D.    Declare that BLM's issuance of the Integrated Vegetation Management for Resilient Lands Environmental Assessment, associated Decision Record and Finding of No Significant Impact, and Final Late Mungers Determination of NEPA Adequacy is arbitrary, capricious, an abuse of agency discretion and contrary to law, in violation of Section 706(2)(A) of the Administrative Procedure Act;

E.    Vacate the Integrated Vegetation Management for Resilient Lands Environmental Assessment, Decision Record, Finding of No Significant Impact, and the Final Late Mungers Determination of NEPA Adequacy and remand the same to BLM;

F.    Enjoin BLM and any of its contractors, agents, or assigns from implementing any project activities flowing from the Integrated Vegetation Management for Resilient Lands Environmental Assessment, Decision Record, and Finding of No Significant Impact, including the Penn Butte timber sale and the Late Mungers timber sale;

G.    Award ASA its reasonable fees, costs, and expenses, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act and any other applicable statutes;

H.    Grant any further and additional relief as the Court may deem just and proper.

Dated: August 10, 2023.

Respectfully submitted,

s/ Sarah A. Matsumoto
Sarah A. Matsumoto, OSB # 111235
Sarah.Matsumoto@colorado.edu
University of Colorado School of Law
2450 Kittredge Loop Road
Boulder, CO 80309
(206) 351-5515

*Attorney for Plaintiff*

Complaint for Declaratory and Injunctive Relief                                            29