Sarah A. Matsumoto, OSB #111235
Sarah.Matsumoto@colorado.edu
Alexandra Nielsen*
Nestor Rodriguez*
Adam Wolnski*
University of Colorado Law School
Natural Resources, Energy, and Environmental Law Clinic
2450 Kittredge Loop Road
Boulder, CO 80309
(206) 351-5515
*Attorney for Plaintiff Applegate Siskiyou Alliance*
*LR 83-5 Eligible Law Students

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER**, *et al.* | Case No.: 1-23-cv-00519-CL (Lead Case)<br>Case No.: 1-23-cv-01163-CL (Trailing Case) |
| Plaintiffs, | |
| v. | PLAINTIFF APPLEGATE SISKIYOU ALLIANCE'S COMBINED RESPONSE/REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT |
| **UNITED STATES BUREAU OF LAND MANAGEMENT**, | Oral Argument Set for April 2, 2024 at 2:00 p.m. |
| Defendant, | |
| and | |
| **AMERICAN FOREST RESOURCE COUNCIL; ASSOCIATION OF O&C COUNTIES,** | |
| Intervenor-Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

ARGUMENT ...................................................................................................................... 1

I.      BLM's failure to take a hard look at the effects of the IVM-RL Program violated NEPA. ....................................................................................................................... 1

    A.    BLM acted arbitrarily and capriciously in its analysis of the IVM-RL Program's effects on recreation because the agency failed to consider important aspects of the problem. ............................................................................................................ 2

    B.    BLM acted arbitrarily and capriciously in supporting the IVM-RL Program's management treatments because its explanation for those treatments runs counter to the fire resilience evidence before the agency, and the agency fails to consider important aspects of resilience to stand-replacing fire. ............................................. 6

    C.    BLM failed to take a hard look at the IVM-RL Program's effects on NSO by providing explanations that run counter to the evidence before the agency and ignoring important aspects of NSO's resistance to disturbances. ............................... 11

    D.    BLM's failure to analyze the reasonably foreseeable site-specific effects of the IVM-RL Program violated NEPA and was arbitrary and capricious. .................................. 15

II.     BLM violated NEPA when it failed to prepare an Environmental Impact Statement, and its Finding of No Significant Impact was arbitrary, capricious, and contrary to law. ....................................................................................................................... 9

    A.    BLM must prepare a site-specific EIS for the IVM-RL Program. ............................. 20

        1.  Context mandates preparation of an EIS. .................................................... 21

        2.  The intensity factors mandate preparation of an EIS. ................................... 22

          a.  The IVM Program is highly controversial. ........................................... 22

          b.  The effects of the IVM Program are highly uncertain. .......................... 24

          c.  The IVM Program's likely adverse effects on endangered and threatened species require preparation of an EIS. ............................................................ 27

          d.  BLM ignores the unique geographic characteristics of the area, which support the need for an EIS. ......................................................................... 30

      e.   The IVM-RL Program threatens a violation of FLPMA. ......................................31

III.   BLM's approval of the IVM-RL Program and Late Mungers Project violated FLPMA. ....31

IV.   BLM's approach undermines public participation. ..................................................34

CONCLUSION ...................................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Anderson*, 314 F.3d 1006 (9th Cir. 2002) ........................................................................ 26

*Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020)...................................... 22-23

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) .................. 26

*California v. Block*, 690 F.2d 753 (9th Cir. 1982)............................................................ 25

*Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271 (D. Or. 2013).......................... 28

*Environmental Defense Center v. BOEM*, 36 F.4th 850 (9th Cir. 2022).............................. 26-27

*Environmental Protection Information Center v. U.S. Forest Service*, 451 F.3d 1005 (9th Cir. 2006) ........................................................................................................................ 28

*Env't Def. Ctr.*, 36 F.4th at 875 ........................................................................................ 14

*Env't Def. Ctr.*, 36 F.4th at 875. ....................................................................................... 10

*EPIC*, 451 F.3d at 1010. .................................................................................................... 28

*Foundation for North American Wild Sheep v. U.S. Dept. of Agr.*, 681 F.2d 1172, 1179 (9th Cir. 1982) ......................................................................................................................... 27

*Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998) ..................... 17

*Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003) .................................... 25

*Great Basin Mine Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) ................. 14

*Greater Bos. Television Corp.*, 444 F.2d 851 ............................................................ 9, 13, 15, 18

*Greater Hells Canyon Council v. Wilkes*, 2023 WL 6443823 (Aug. 21, 2023 D. Oregon) ......... 21

*Greater Hells Canyon v. Wilkes*, 2023 WL 6443823 (D. Or. 2023)......................................... 22

*Idaho Sporting Congress v. Thomas*, 137 F.3d 1146 (9th Cir. 1998)...................................... 22

*In Def. of Animals*, 751 F.3d at 1069 ............................................................................... 22

*Kern v. US Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ....................................... 17

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F.Supp.2d 1069 (E.D. Cal. 2004) ... 28

*Monsanto Co., et al. v. Geertson Seed Farms, et al.*, 561 U.S. 139 (2010)................................ 21

*N. Alaska Env't Ctr. v. US Dep't of the Interior*, 983 F.3d 1077 (9th Cir. 2020)............. 13, 14, 15

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)........................ 21, 25

*Native Ecosystems Council*, 428 F.3d at 1240 ............................................................... 28

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009)......... 15

*Northern Alaska Environmental Center v. U.S. Dept. of Interior*, 983 F.3d 1077 (9th Cir. 2020) ...................................................................................................................................... 25

*Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) .............. 22, 25

*Or. Wild v. Bureau of Land Management*, 2015 WL 1190131 (D. Or. Mar. 14, 2015) .............. 28

*Oregon Nat. Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ..................................... 14

*Oregon Natural Resources Council Fund v. Brong*, 492 F.3d 1120 (2007)................................ 20

*S. Fork Band Council Of W. Shoshone Of Nevada v. US Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009) ......................................................................................................................... 20

*Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944 (9th Cir. 2003)................................. 26

*Sierra Club v. Hathaway,* 579 F.2d 1162 (9th Cir. 1978) ............................................... 15

*Sierra Club v. U.S. Forest Service*, 843 F.2d 1190 (9th Cir. 1988)....................................... 27

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm*, 463 US at 29 (1983) ......................... 11, 15, 18

*Te-Moak Tribe of W. Shoshone of Nevada v. US Dep't of Interior*, 608 F.3d 592, 596 (9th Cir. 2010) ......................................................................................................................... 19

**Statutes**

42 U.S.C. § 433................................................................................................................ 21

**Administrative Materials**

40 C.F.R. 1508.27(b)(3)............................................................................................ 14, 15
Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act
    Regulations, 46 Fed. Reg. 18026-01, 18037 (March 23, 1981)................................. 23

**Other**

*A Global Perspective on the Biodiveristy of the Klamath-Siskiyou Ecoregion*, 19 NAT. AREAS
    J. 300, 300–02 (1999) ............................................................................................. 34

**Table of Acronyms**

| APA | Administrative Procedure Act |
|---|---|
| BLM | Bureau of Land Management |
| BMP | Best Management Practices |
| CSFM | Clean Slate Forest Management |
| DNA | Determination of NEPA Adequacy |
| EA | Environmental Assessment |
| ERMAs | Extensive Recreation Management Areas |
| ERO | Ecosystem Resilience-Open |
| FWS | Fish and Wildlife Service |
| IVM-RL | Integrated Vegetation Management for Resilient Lands |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| PRMP/FEIS | Proposed Resource Management Plan / Final Environmental Impact Statement |
| RMAs | Recreation Management Areas |
| RMP | Resource Management Plan |
| ROS | Recreation Opportunity Spectrum |
| SRMAs | Special Recreation Management Areas |

## ARGUMENT

**I.**     **BLM's failure to take a hard look at the effects of the IVM-RL Program violated NEPA.**

Through the National Environmental Policy Act ("NEPA"), Congress requires federal agencies to take a hard look at the environmental effects of a proposed agency action and its alternatives when "deciding whether to pursue a particular federal action." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 100 (1983). An agency takes a hard look at the effects of a federal action by giving "reasoned consideration to all the material facts and issues." *Greater Bos. Television Corp. v. Fed. Commc'ns Comm'n*, 444 F.2d 841, 851 (D.C. Cir. 1970). "Vague and conclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006).

Certainly, Congress means for an Environmental Assessment ("EA") to serve as a "concise, public document" that allows an agency to reliably determine "whether to prepare an environmental impact statement." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). However, it is also certain that "an agency 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts." *Id.* at 872-73 (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005)). Federal agencies act arbitrarily and capriciously when they rely on flawed assumptions throughout an EA because when an agency fails to take "a 'hard look' at the salient problems," it "has not genuinely engaged in reasoned decision-making." *Greater Bos. Television Corp.*, 444 F.2d at 851; *Env't Def. Ctr.*, 36 F.4th at 875.

Bureau of Land Management's ("BLM's") analysis of the effects of the Integrated Vegetation Management for Resilient Lands ("IVM-RL") Program violated NEPA and the Administrative Procedure Act ("APA"). The agency did not take a hard look at the IVM-RL

Program's numerous environmental impacts. Instead, it relied on faulty assumptions that the agency failed to reliably explain in the IVM-RL EA. Specifically, the BLM did not take a hard look at the IVM-RL Program's effects on recreation, fire resiliency, Northern Spotted Owl ("NSO") habitats, and site-specific impacts. Since the BLM relied on flawed assumptions throughout the EA, the agency acted arbitrarily and capriciously in approving the IVM-RL Program.

   **A. BLM acted arbitrarily and capriciously in its analysis of the IVM-RL Program's effects on recreation because the agency failed to consider important aspects of the problem.**

   The absence of evidence in the record belies BLM's claims that it took a hard look at the IVM-RL Program's effects on recreation. BLM Mem. 28. To begin, BLM placed its asserted hard look analysis of the IVM-RL Program's effects on recreation in Appendix 10 of the EA titled *Issues Considered but Not Analyzed in Detail*. AR 02822; AR 02851-53. Furthermore, BLM's rationale for determining the IVM-RL Program's effects on recreation consisted of two paragraphs. AR 02853. BLM cannot claim to have given the IVM-RL Program's environmental impacts on recreational opportunities a hard look while also recognizing that it did not consider the issue in detail and only providing two paragraphs of rationale. "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998).

   More important than the location and length of the EA's cursory mention of the IVM-RL Program's effects on recreation is BLM's failure to thoroughly examine whether the IVM-RL Program's proposed actions would shift lands in the treatment area to more developed Recreation Opportunity Spectrum ("ROS") classes. AR 02853. The Medford District has twenty-two units

(42,911 acres) of Special Recreation Management Areas ("SRMAs") and forty-six units (184,274 acres) of Extensive Recreation Management Areas ("ERMAs") within the IVM-RL Program's treatment area. AR 02852. To rephrase, the IVM-RL Program's treatment area includes 227,185 acres or 92.5 percent[1] of the total number of acres designated as Recreation Management Areas ("RMAs") in the Medford District. AR 48678-79 (Table G-2). Therefore, the IVM-RL Program's impacts on recreation could be severe and widespread and undermine the RMA network designated in the 2016 Resource Management Plan ("RMP"). *Id.*

The EA incorporates a figure from the Proposed Resource Management Plan/Final Environmental Impact Statement ("PRMP/FEIS") that describes BLM's six ROS classes and their corresponding qualities. AR 02853 (Table 67). The IVM-RL Program's treatment area includes SRMAs and ERMAs across five ROS classes: backcountry, middle country, front country, rural, and urban. AR 02852 (Table 66). The PRMP/FEIS uses both "remoteness ***and*** naturalness characteristics to identify and categorize recreation setting characteristics through [ROS] classes." AR 02852 (emphasis added). BLM determines remoteness characteristics by the number of roads in an area and naturalness by forest structural stage classes. *Id.* For example, a middle country ROS is characterized by a natural-appearing landscape with modifications that do not overpower natural features, a remoteness characteristic, and a young high-density stand with structural legacies, or a young low-density stand with or without structural legacies, naturalness characteristics. AR 02853 (Table 67).

---

[1] The total number of RMA acres within the Medford District was calculated by adding the acres listed in Table G-2 in the Southwestern Oregon Record of Decision/Resource Management Plan. Table G-2 lists the RMAs within the Medford District. Three of the RMAs listed were less than one acre. In calculating the total number of RMA acres within the Medford District, the three RMAs that were less than one acre were accounted for by adding one acre to the sum of the other RMAs.

BLM assumes no proposed actions in the IVM-RL Program would negatively affect the ROS classes of RMAs in the treatment area. AR 02853. This assumption is based on a sentence in the PRMP/FEIS that states that thinning dense, young stands would theoretically change an area's naturalness from the front country to the middle country setting, thus moving an area to a less developed ROS class. AR 02853 (quoting AR 51651). However, forest management activities in RMAs in the IVM-RL Program's treatment area are not limited to "thinning dense, young stands" but include various timber harvesting and fuel reduction techniques. AR 02612-13 (Table 2). For example, the backcountry ROS is characterized by both a natural-appearing landscape with modifications not readily noticeable, the remoteness characteristic, and a mature single- or multi-layered canopy, the naturalness characteristic. AR 02853 (Table 67). The IVM-RL Program's treatments in backcountry ROS classes could impact the naturalness of these areas by creating group selection openings, reducing mature and old forest canopies, removing mature trees, and eliminating multi-layer canopy structures. AR 02612-13 (Table 2). Specifically, the IVM-RL Program could destroy 70 percent of canopy cover in backcountry ROS classes (AR 02642 (Table 15)) and create gaps up to four acres in 25 percent of a backcountry stand. AR 02630. These treatments could shift or downgrade the backcountry ROS areas to the more developed middle country ROS by reducing the backcountry's mature canopy and leaving a young stand with some structural legacies. AR 02853 (Table 67). Although the IVM-RL EA concluded that 19,145 acres[2] of backcountry ROS would be within the IVM-RL Program's treatment area, the EA contained no analysis on how treatments will impact this ROS class. AR 02852-53.

---

[2] The total number of backcountry acres in the IVM-RL treatment area was calculated by adding the ERMA acres categorized as backcountry and the SRMA acres categorized as backcountry.

Despite the variety of management techniques authorized in the IVM-RL Program and the range of ROS classes in the treatment area, the EA contained only general statements about the theoretical effects of management directives on a few ROS classes. AR 02853. This lack of analysis fails NEPA's hard look requirements. *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. BLM's failure to take a hard look at how these activities will impact ROS classes is particularly egregious when the PRMP/FEIS concluded, in the same section the EA pulls its cited language from, "[s]ome land management actions, such as timber harvest and wildland fire and fuels management, ***would*** change landscapes, or result in temporary closures within and surrounding RMAs." AR 51660 (emphasis added).

The PRMP/FEIS supports the conclusion that the management activities approved in the IVM-RL Program will impact ROS classes or, at a minimum, cause temporary recreational closures. *Id.* Still, the IVM-RL EA only contained conclusory statements, based on theoretical stand treatments, that the IVM-RL Program will not adversely impact ROS classes. AR 02853. Congress's hard look requirement under NEPA cannot be satisfied with "vague and conclusory statements." *Hankins*, 456 F.3d at 973. BLM acted arbitrarily and capriciously when it failed to consider how different timber harvesting and wildland fire and fuels management techniques, an essential aspect of the problem, will impact ROS classes. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The IVM-RL EA assures that developed recreation sites will be closed to new road construction and that no new road construction will occur in backcountry areas. AR 02853. However, as demonstrated, these assurances are insufficient to support a conclusion that the IVM-RL Program will preserve ROS Classes. *Id.* The assurance that no new road construction will occur in developed recreation sites merely addresses the remoteness component of ROS Classes, and it

ignores the naturalness component, which is severely threatened by the IVM-RL Program's treatments.

BLM needed to address how the various management techniques authorized in the IVM-RL Program will affect structural stage classes across the five ROS classes in the treatment area. It did not. BLM cannot satisfy Congress's hard look requirement when it fails to consider how the IVM-RL Program's timber harvesting and fuel management techniques will impact the naturalness of all ROS classes, and this failure to analyze an essential aspect of ROS characterizations is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Finally, that SRMAs and ERMAs will experience a change in characteristics, thereby impeding recreational opportunities, is not contradicted by the record (BLM Mem. 28) but affirmed in the PRMP/FEIS, which concluded that timber harvesting and wildland fire fuels management *would* change landscapes or, at a minimum, cause temporary closures to RMAs. AR 51660. BLM's failure to go beyond "vague and conclusory statements" concerning the IVM-RL Program's effects on the naturalness of the five ROS classes in the treatment area, *Hankins,* 456 F.3d at 973, is a failure to give a hard look to the effects of the IVM-RL Program on recreation and a failure to consider an essential aspect of the problem in violation of NEPA and the APA. *State Farm*, 463 U.S. at 43.

**B. BLM acted arbitrarily and capriciously in supporting the IVM-RL Program's management treatments because its explanation for those treatments runs counter to the fire resilience evidence before the agency, and the agency failed to consider important aspects of resilience to stand-replacing fire.**

BLM failed to take a hard look at the impacts of the IVM-RL Program on fire resilience because BLM did not give "reasoned consideration to all the material facts and issues" surrounding the approved timber management activities and their effects on fire resiliency. *Greater Bos. Television Corp.*, 444 F.2d at 851. A hard look must include a "discussion of adverse impacts that

does not improperly minimize negative side effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006). BLM offered no such discussion of adverse impacts but provided explanations that run counter to the evidence before the agency on resilient forests in southwest Oregon. *State Farm*, 463 U.S. at 43. Additionally, the agency acted arbitrarily and capriciously by failing to consider important aspects of stand-replacing fire in its assessment of fire resiliency. *Id.*

BLM's explanation for the IVM-RL Program runs counter to the evidence before the agency on fire resiliency in southwestern Oregon. The IVM-RL Program allows a range of management techniques, including logging large fire-resistant trees, dramatically opening forest canopies, and encouraging the regeneration of dense, young vegetation. AR 02612-13 (Table 2). In BLM's Clean Slate Forest Management ("CSFM") Project site-specific EA analysis on the Medford District, the agency concluded that the same management techniques approved in the IVM-RL Program increased fire risk in treated stands for twenty years. AR 44758. Although, in terms of the CSFM Project, BLM concluded that the plan would contribute to the restoration of fire-adapted ecosystems, it only came to this conclusion after thoroughly discussing the risk of the CSFM Project increasing fire risk over the first two decades following harvest. AR 44758-59.

The IVM-RL EA contained no similar discussion. Instead, BLM minimized the IVM-RL Program's risks and concluded, counter to the evidence in the CSFM EA, that the effects of the IVM-RL Project's harvesting prescriptions would only cause an increase in fire risk for one to two years. AR 02624. Additionally, where the CSFM Project ensured that a "fuels management specialist ***would*** treat" the increase in surface fuels caused by harvesting (AR 44758) (emphasis added), the IVM-RL EA stated that residual fuels would be treated "as needed." AR 02624. BLM did not thoroughly address the IVM-RL Program's potential to increase fire risk and avoided its own site-specific analysis to incorrectly assume that the effects of the IVM-RL Program would be

minimal. *Id.* This explanation runs counter to the analysis in the CSFM EA and is arbitrary and capricious. AR 44758-59; AR 02624; *State Farm*, 463 U.S. at 43.

The analysis in the CSFM EA further demonstrated that the conversion from mature forest to young regeneration or early seral vegetation and "brush fuel types" associated with group selection logging is partly responsible for the potential twenty-year increase in fire risk following treatments. AR 44758. Despite the evidence in the CSFM EA, BLM failed to thoroughly analyze how the IVM-RL Program's group selection logging prescriptions would avoid creating "brush fuel types" and early seral vegetation to decrease the possibility of the treatments increasing fire risk. Instead of thoroughly addressing the risk of group selection logging described in the CSFM EA, BLM concluded in the IVM-RL EA that it would apply group selection logging treatments to create "[o]pportunities for new regeneration." AR 02763. Additionally, BLM concluded that the IVM-RL Program's group selection logging treatments would serve as a means of "[t]urning over portions of stands" and "allow for a vigorous, young cohort to establish." AR 02736. Although BLM recognized that group selection logging would shift mature forests to young stands with early seral vegetation, the agency ignored the risks accompanying these treatments as described in the CSFM EA. A hard look must include a thorough discussion of adverse impacts that does not improperly minimize those impacts. *Kempthorne*, 457 F.3d at 975. BLM failed to engage in reasoned decision-making and acted arbitrarily and capriciously when it concluded that the IVM-RL Program's group selection logging prescriptions would increase early seral vegetation in treated stands but that this shift would not increase fire risk because this conclusion runs counter to the site-specific evidence before the agency in the CSFM EA. *State Farm*, 463 U.S. at 43.

BLM's conclusion that the IVM-RL Program's management techniques will positively impact stand-level fire hazard and fire resistance within the treatment area relies on an analysis that

fails to give "reasoned consideration to all the material facts and issues" in violation of NEPA's hard look requirement. *Greater Bos. Television Corp.*, 444 F.2d at 851. The IVM-RL EA admitted that the PRMP/FEIS did not consider how interactions among fuels, topography, and weather can significantly increase fire risks. AR 02620. Although the EA concluded that "fire behavior is a product of fuels, weather, and topography," which the PRMP/FEIS analysis did not consider, BLM goes on to make assumptions about fire resiliency in the IVM-RL Program's treatment area based on one factor, crown fire initiation potential. AR 02620-21. After determining the theoretical crown fire initiation potential, which the EA says cannot reflect accurate fire behavior because the analysis does not include the relationship between fuels, weather, and topography across different treatment types, BLM makes a faulty assumption about the relative resistance of the treated stands to stand-replacement fire. *Id.* However, this analysis of fire resiliency only looked at how the IVM-RL Program's treatments would theoretically impact crown fire potential and ignored that stand-replacing fires can also originate from high-severity surface fires or ground fires, an important aspect of the problem. *Id.*

BLM's failure to include high-severity surface and ground fires in its analysis of forest resiliency is another example of the agency failing to take a hard look at material facts and issues. *Greater Bos. Television Corp.*, 444 F.2d at 851. First, the RMP defined stand-replacement fire as "crown fires, high-severity surface fires, *or* ground fires." AR 48730 (emphasis added). Despite this clear definition of stand-replacement fire, the IVM-RL EA only considered stand-replacement fire resiliency to correspond with crown fire initiation potential. AR 2620-21. Furthermore, the IVM-RL EA repeatedly cited a study by Erik Martinson and Philip Omi for the USDA Forest Service titled *Fuel Treatments and Fire Severity: A Meta-Analysis.* AR 02621; AR 02624; AR 02628; AR 02634; AR 02654; AR 02764-65; AR 02772; AR 02847. The Martinson study listed

nineteen publications that contained empirical evidence of fuel treatment effectiveness and met all

the criteria for inclusion in the meta-analysis: "indicating study location(s), dominant vegetation

type(s), treatment type(s), whether fuel conditions were measured, whether treatment age was

reported, the response variable(s) measured, and whether control for weather and topography was

demonstrated." AR 59116. One of the nineteen studies that met all of Martinson's criteria was

conducted by Crystal Raymond and David Peterson and titled *Fuel Treatments Alter the Effects of*

*Wildfire in a Mixed Evergreen Forest, Oregon, USA*. AR 59118; AR 59124. Despite the Raymond

study being one of nineteen that the Martinson meta-analysis listed as an exceptionally reliable

publication containing empirical evidence of fuel treatment effectiveness, and despite the Raymond

study being conducted in southwest Oregon, the location of the IVM-RL Program, the IMV-RL

EA does not cite this study once. Perhaps BLM's ignorance of the Raymond study has to do with

its discussion on the aftermath of the Biscuit fire and how researchers should model fire behavior:

> Crown damage to overstory trees in the Biscuit fire was extensive despite low
> crown fire potential and the absence of crown fire at this site during the Biscuit fire.
> **Crown fire is not a prerequisite for high fire severity**, because crown scorch from
> high-intensity surface fires can also cause tree damage and mortality (Ryan et al.
> 1988). **Evaluating fuel treatments based only on potential fire behavior may not
> adequately reflect treatment effects on fire severity parameters** such as crown
> scorch and related mortality. Crystal L. Raymond & David L. Peterson, *Fuel
> Treatments Alter the Effects of Wildfire in a Mixed-Evergreen Forest, Oregon,
> USA*, 35 Can. J. For. Res. 2981, 2990-91 (2005) (emphasis added).

BLM's faulty modeling is based on the likelihood of crown fire initiation and erroneously equates

this one form of stand-replacing fire to how resistant a stand is to all stand-replacing fires. AR

02620-21. BLM acted arbitrarily and capriciously when it relied on such a flawed assumption to

support its conclusion that the IVM-RL Program will positively impact forest resiliency to stand-

replacing fires in the treatment area. *Env't Def. Ctr.*, 36 F.4th at 875.

Although NEPA does not require a substantive outcome, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989), "[a]ccurate scientific analysis . . . [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). BLM did not conduct accurate scientific analysis but instead cherry-picked science to reach an ingenuine decision violating Congress's hard look requirement. *Greater Bos. Television Corp.*, 444 F.2d at 851. By ignoring relevant science and relying on a model that only concerned itself with one form of stand-replacing fire, BLM failed to give "reasoned consideration to all the material facts and issues" and did not engage in "reasoned decision-making" but acted arbitrarily and capriciously in its examination of the effects of the IVM-RL Program on fire resilience. *Id.*

### C. BLM failed to take a hard look at the IVM-RL Program's effects on NSO by providing explanations that run counter to the evidence before the agency and ignoring important aspects of NSO's resistance to disturbances.

BLM did not take a hard look at the effects of the IVM-RL Program on NSO and its habitat. A hard look requires agencies to discuss adverse impacts thoroughly and not "improperly minimize negative side effects." *Kempthorne*, 457 F.3d at 975. Additionally, a hard look cannot rely on "[g]eneral statements about 'possible effects.'" *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. In examining the IVM-RL Program's threat to NSO and its habitat, BLM provided vague explanations on how it would only insignificantly affect NSO and its habitat. These explanations run counter to the evidence before the agency and inaccurately minimize the IVM-RL Program's adverse impacts. *State Farm*, 463 U.S. at 43. Additionally, BLM failed to consider recent studies that found that NSO is experiencing an increasing rate of decline, an important aspect of determining the IVM-RL Program's threat to NSO. *Id.*

In its final rule on NSO critical habitat, the U.S. Fish and Wildlife Service ("FWS") updated its habitat-dependent conservation goals for NSO to include management programs to reduce the

loss of NSO habitat from wildfire accompanied by monitoring programs to determine the effectiveness of risk reduction methods and "[i]n areas of significant population decline, sustain the full range of survival and recovery options for [NSO] in light of significant uncertainty." AR 52024. Although BLM claims to "reconcile these goals," AR 02583, the IVM-RL Program's Ecosystem Resilience-Open ("ERO") prescription neither promotes, develops, nor sustains the NSO's habitat. AR 02642 (Table 15).

BLM acted arbitrarily and capriciously by authorizing the ERO prescriptions in NSO habitat when, according to the evidence before the agency, these prescriptions would adversely impact NSO survival. AR 02653-55. The FWS has concluded that NSO habitat for nesting and roosting requires stands with moderate to high canopy cover, defined as "60 to over 80 percent" canopy cover. AR 12381. Modeling information for the IVM-RL ERO prescriptions found that canopy cover could be as low as 30 percent after treatment. AR 02642 (Table 15). The model also predicted that, after ERO treatments, canopy cover would remain at 38 percent for at least fifty years. AR 02755 (Table 44). The IVM-RL EA even went on to conclude,

> In general, the Ecosystem Resilience Open prescriptions (Alternative C) would remove spotted owl [nesting-roosting], [foraging], and dispersal-only habitat because the post-harvest canopy cover is expected to be below 40 percent. In addition, existing multi-canopy, uneven age tree structure, and key habitat features would not remain post-treatment. These treatment acres would not be expected to provide suitable [nesting-roosting] or [foraging] habitat for many years post-treatment. AR 02779.

BLM ignored its hard look requirement and attempted to minimize the IVM-RL Program's threats to NSO habitat by promising that no habitat removal or downgrading from vegetation treatments would occur. AR 02642. However, these assurances fall flat because the Late Mungers Project Determination of NEPA Adequacy ("DNA") Worksheet approved ERO treatments in 461 acres of suitable NSO habitat. AR 00021 (Table 12). In fact, the Late Mungers Project *only*

approved ERO treatments on NSO sites. AR 00024. Furthermore, BLM surveyed the Late Mungers Project's ERO treatment area and found three sites currently supported NSO pairs, and eight sites were suitable NSO habitats. AR 00020. Despite these survey results, BLM provided no thorough explanation on how it planned to move forward with the Late Mungers Project's ERO treatments without taking one NSO individual that it identified during its survey or incidentally taking any NSOs by destroying critical habitat in one of the eight sites that it identified as suitable habitat. *Id.*

Minimizing the IVM-RL Program's immediate effects on NSO is arbitrary and capricious because, according to the evidence before the agency, ERO treatments will decimate habitat conditions in treated stands. Furthermore, the promise that BLM will not employ ERO treatments near NSO individuals or their suitable habitat is fiction, as demonstrated by the Late Mungers Project. *Kempthorne*, 457 F.3d at 975; AR 12381. BLM has not "genuinely engaged in reasoned decision-making" by failing to take a hard look at how the IVM-RL Program's habitat modifications will impact NSO, a species with a significantly uncertain future. *Greater Bos. Television Corp.*, 444 F.2d at 851.

BLM also improperly minimized the short-term effects of the IVM-RL Program with far-off promises of long-term benefits in violation of NEPA's hard look requirement. *Kempthorne*, 457 F.3d at 975. The IVM-RL EA concluded that treatments would destroy 0.4 percent of nesting-roosting habitat and 2.9 percent of foraging habitat. AR 02653. In addition to destroying NSO habitat, the IVM-RL Program will "modify" 9 percent of nesting-roosting, 11 percent of foraging, and 35 percent of dispersal-only habitat. AR 02654. After concluding that the IVM-RL Program would modify 55 percent of NSO critical habitat, BLM assumed that this modification would not impact the function of the habitat. *Id.* Additionally, the IVM-RL EA did not examine how both the reduction of NSO habitat and the modification of NSO habitat together could impact NSO survival.

BLM failed to take a hard look at the effects of the IVM-RL Program on NSO habitat by inadequately examining how the destruction and modification of NSO habitat could impact the struggling species. "Vague and conclusory statements" about the irrelevancy of short-term consequences accompanied by the potential for long-term benefits improperly minimized the threat of the IVM-RL Program's effects on NSO. *Hankins,* 456 F.3d at 973. BLM did not take a hard look as required by NEPA. *Kempthorne*, 457 F.3d at 975.

BLM also failed to take a hard look at recent research on NSO by incorrectly assuming that the Franklin et al. 2021 study on NSO survival did not offer "new information" to the agency's 2016 model. AR 02881. Although BLM is not required to "conduct measurements of actual baseline conditions in every situation," "its assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'" *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (quoting *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016)). When baseline conditions rely on inaccurate information and unsupported assumptions, it "materially impede[s] informed decisionmaking and public participation." *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016).

BLM did not apply accurate science when determining the IVM-RL Program's effects on NSO and its habitat, and it acted arbitrarily and capriciously by relying on such flawed assumptions. *Env't Def. Ctr.*, 36 F.4th at 875. The IVM-RL EA states, "Franklin et al. (2021) found that the declines in both apparent survival and recruitment have accelerated since 2014, resulting in further losses to NSO populations ***beyond those reported by Dugger et al. (2016).***" AR 02881 (emphasis added). Despite BLM admitting that the Franklin report indicated a sharper decline in NSO survival than the Dugger report, it goes on to conclude that because its 2016 model accounted for some decline, the "results of the recent studies do not present new information that would create new

effects to spotted owl populations since the PRMP/FEIS." *Id.* This explanation fails to give "reasoned consideration to all the material facts and issues" because the higher rate of decline reported in Franklin could reveal that the IVM-RL Program's effects would hurt NSO survival more severely than its current estimates based on a more gradual decline. *Greater Bos. Television Corp.*, 444 F.2d at 851. BLM acted arbitrarily and capriciously when it failed to consider how NSO's steeper population decline, an important aspect of the problem, may exacerbate the adverse effects of the IVM-RL Program on the NSO. *State Farm*, 463 U.S. at 43.

**D. BLM's failure to analyze the reasonably foreseeable site-specific effects of the IVM-RL Program violated NEPA and was arbitrary and capricious.**

There is no question that the IVM-RL EA was an "irreversible and irretrievable" commitment of resources that mandated BLM to conduct site-specific analyses because BLM claimed that it did adequately conduct such studies, not that they were not required. BLM Mem. 40; *Sierra Club v. Hathaway,* 579 F.2d 1162, 1168 (9th Cir. 1978). The issue here is whether the IVM-RL Program's claimed analysis was sufficient. The "required degree of analytical site specificity depends on the specificity of the 'reasonably foreseeable' environmental impacts in light of the factual context." *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1088-89 (9th Cir. 2020).

In *N. Alaska Env't Ctr.*, the Ninth Circuit had to determine whether BLM satisfied the degree of site specificity necessary for a 2017 oil and gas lease sale. *Id.* To understand the degree of specificity required, the court examined whether the case was more like *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009) or *Kempthorne*, 457 F.3d 969. *Id.* For *Richardson*, the Ninth Circuit noted that the relevant facts in concluding that the agency failed to conduct an adequate site-specific analysis were that

the challenged lease pertained to a relatively small parcel (less than 2,000 acres); considerable exploration had already occurred on parcels adjacent to the leased parcel; a natural gas supply was known to exist beneath these parcels; and the record contained sufficient information on which to predict the number of wells that the leaseholder would want to construct. *Id.* (quoting 565 F.3d at 717-18) (internal quotation marks omitted).

These facts led the Tenth Circuit to hold that the impacts of the planned gas field were reasonably foreseeable, and site-specific effects should have been examined before the lease was approved for the agency to comply with NEPA. *Id.* (quoting *Richardson*, 565 F.3d at 718). In contrast, in *Kempthorne*, the court held that BLM's use of "hypothetical situations that represented the spectrum of foreseeable results" was sufficient to analyze oil and gas leasing. *Id.* (quoting 457 F.3d at 976). The Ninth Circuit concluded that, in the oil and gas leasing context, "until the lessees do exploratory work, the government cannot know what sites will be deemed most suitable for exploratory drilling, much less for development." *Id.* at 1089 n.12 (quoting *Kempthorne*, 457 F.3d at 976).

Here, as in *Richardson*, BLM could reasonably foresee the environmental impacts of the IVM-RL Program, but it failed to examine those details sufficiently, and this failure was arbitrary and capricious. 565 F.3d at 718-19. BLM planned for the Late Mungers Timber Sale as the scoping process for the IVM-RL EA began. Declaration of Luke Ruediger at ¶ 9. During the scoping process, BLM admitted that it had completed a first-year botany survey in the general area of the planned timber sale and that the sale was being considered for the "late successional reserve in the Munger's peak area, west of Williams." AR 42803. As in *Richardson*, BLM could reasonably foresee the environmental impacts of the IVM-RL Program's prescriptions in the Munger's peak area because the agency considered the plan in a relatively small area and surveys had already been conducted in nearby parcels. 565 F.3d at 718-19. Despite these "reasonably foreseeable"

environmental impacts considering the Late Mungers Timber Sale, the IVM-RL EA contains zero analysis on how the IVM-RL Program would potentially impact the specific area of Munger's peak.

"If it is reasonably possible to analyze the environmental consequences of a particular type at a particular stage, the agency *is required* to perform that analysis. *N. Alaska Env't Ctr.*, 983 F.3d at 1088 (quoting *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1072 (9th Cir. 2002)) (internal quotation marks omitted) (emphasis added). BLM did not perform any site-specific analysis on the environmental impacts of the IVM-RL Program's treatments in the area it knew it was considering for the Late Mungers Timber Sale. It did not explain eliminating alternative sites in the IVM-RL EA or the Late Mungers DNA. Instead, BLM "put the cart before the horse" by choosing a specific site for the IVM-RL Program but never actually explaining the particular effects of implementing the prescriptions on that site or nearby sites where surveys had been conducted. *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1069 (9th Cir. 1998).

A court "will defer to the agency's judgment about the appropriate level of analysis *so long as* the EIS provides as much environmental analysis *as is reasonably possible* under the circumstances, thereby providing sufficient detail to foster informed decision-making at the stage in question." *Native Vill. of Point Hope v. Jewell,* 740 F.3d 489, 498 (9th Cir. 2014) (quoting *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003)) (internal quotation marks omitted) (emphasis added). BLM had sufficient information to conduct a site-specific analysis on the Late Mungers Timber Sale in the IVM-RL EA. AR 42803 (July 25, 2019 correspondence). The impacts of the planned Late Mungers Timber Sale were reasonably foreseeable, and BLM was required to examine the site-specific impacts of the project to comply with NEPA. *Richardson*, 565 F.3d at 718-19.

BLM and Intervenors rely on *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969 (9th Cir. 2006) to justify a combined programmatic and site-specific NEPA document. BLM Mem. At 49-50; Intervenor Mem. 53-54. But the IVM-RL EA is dissimilar from the EIS the court approved in *Kempthorne*. In *Kempthorne*, BLM at least applied site-specific analyses that "represented the spectrum of foreseeable results." 457 F.3d at 976. BLM did not analyze such a spectrum in the IVM-RL EA. Instead, BLM failed to take a hard look at the extraordinarily different treatment sites and how their varying characteristics could influence their responses to the IVM-RL Program. *Greater Bos. Television Corp.*, 444 F.2d at 851. BLM's failure to address essential variables across the IVM-RL Program treatment area failed to consider important aspects of how the IVM-RL Program will affect treatment sites and arbitrary and capricious. *State Farm*, 463 US at 43.

Throughout the PRMP/FEIS and the IVM-RL EA, BLM concluded how vital topography and soil are to understanding landscape successional patterns and fire resilience. AR 02618; AR 02620. However, instead of analyzing how the IVM-RL Program will influence treatment areas on various topographic conditions and soils, BLM applied a model that did not account for soils and only examined fire behavior according to a mean slope of 50 percent. AR 02770. Specifically, the IMV-RL EA concluded, "[s]lope is an important input for fire behavior predictions. The slope is variable across the Treatment Area. The mean slope of 50 percent was used in model predictions." *Id.* The quoted language in the preceding sentences is BLM's entire discussion on how topography is represented in the IVM-RL EA modeling predictions. *Id.* The agency even failed to explain why a 50 percent mean slope was selected. *Id.* The unlawfulness of the IVM-RL EA site-specific analysis is not because BLM conducted its analyses in a document that it claims is programmatic and site-specific but because its site-specific model failed to address variables that BLM concluded

are essential to accurately predicting fire behavior. AR 02618 (importance of topography); AR 02726-27 (importance of aspect and soil types); AR 02807 (importance of aspect and soil types).

BLM and Intervenors rely on another mining case, *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592 (9th Cir. 2010), and once again, the case is distinguishable. BLM Mem. at 39-40; Intervenor Mem. at 54. In *Te-Moak*, the agency action at issue was a mineral exploration project. 608 F.3d at 596-98. In holding that BLM did not violate NEPA by approving the exploration project without knowing specific drill sites, the Ninth Circuit required that the site-specific deficiencies be accompanied by an analysis of the "impact of drilling activities in all parts of the project area" and the imposition of "effective avoidance and mitigation measures to account for unknown impacts." *Id.* at 600-01. BLM did not adequately analyze the impacts of the IVM-RL Program on all parts of the project area, and its mitigation measures are ineffective. BLM attempted to minimize the potential effects of the IVM-RL Program on specific sites by claiming that project design features and best management practices ("BMPs") would be employed at the site level to "reduce or avoid [the IVM-RL Program's] impacts to different resources." AR 02601. Although the IVM-RL EA contained a table of BMPs that spans sixteen pages, it failed to describe any monitoring and enforcement program that would ensure the BMPs are consistently employed to minimize the IVM-RL Program's environmental harm. AR 02710-25. This failure contrasts with *Te-Moak*, where BLM developed a strict exclusion zone protocol that would halt surface disturbing activities when an undiscovered cultural resource was later discovered. 608 F.3d at 601.

Here, BLM could have developed a protocol that halted any IVM-RL Program prescriptions that BMPs were not effectively mitigating on a particular site because of its unique characteristics. It did not. Instead, BLM outright rejected adopting a monitoring program that could have accounted

for unknown site-specific impacts because it was unclear to BLM "what results or conditions should be monitored, what results or conditions might trigger adapting current or future management actions in the program of work, or how those adapted management actions would differ." AR 02818. BLM admitting that it does not know how to monitor the effectiveness of BMPs at the site-specific level to ensure that the IVM-RL Program's prescriptions are being effectively implemented to reduce and avoid its adverse impacts is concerning, to say the least, and certainly, a failure to impose "effective avoidance and mitigation measures to account for unknown impacts." *Te-Moak*, 608 F.3d at 600-01. Even more, an agency's failure to thoroughly assess the effectiveness of mitigation measures fails to satisfy NEPA's hard look requirement. *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 727 (9th Cir. 2009).

Unlike *Te-Moak*, BLM failed to analyze the impacts of treatments across variables that would represent the entire project area and failed to ensure that unknown impacts would be mitigated. The IVM-RL Program's site-specific deficiencies cannot be minimized, and BLM violated NEPA by failing to conduct a site-specific analysis of the IVM-RL Program's reasonably foreseeable effects. *N. Alaska Env't Ctr.*, 983 F.3d at 1088-89.

## II.  BLM violated NEPA when it failed to prepare an Environmental Impact Statement, and its Finding of No Significant Impact was arbitrary, capricious, and contrary to law.

In defending against ASA's argument that it should have prepared an EIS, BLM urges the court to defer to its claimed expertise. BLM Mem. at 12, 20, 31, 41, 43. But simply claiming expertise does not automatically entitle an agency to the deference BLM seeks. A court should not defer to an agency decision that is without a substantial basis in fact. *Native Ecosystems Council*, 418 F.3d at 960 (citations omitted). To avoid a finding of arbitrary and capricious action, the agency must show a "rational connection between facts found and conclusions made." *Brong*, 492

F.3d at 1125. BLM's decision to rely on an EA, instead of preparing an EIS, is without basis in fact, and this Court should require BLM to prepare an EIS.

**A. BLM must prepare a site-specific EIS for the IVM-RL Program.**

Whether a federal action is significant under NEPA depends on *context* and *intensity*. 40 C.F.R. § 1508.27; *see also* ASA Mem. at 12 (discussing intensity factors). Here, both context and several intensity factors necessitate preparing an EIS.

1. Context mandates preparation of an EIS.

The context that BLM is required to consider while determining whether to prepare an EIS includes impacts based on the affected *region*, affected *interests*, and affected *locality*. 40 C.F.R. § 1508.27(a) (emphasis added). Here, the IVM-RL Program covers most of the southwest portion of the state, the project area is 875,290 acres. AR 2560. It authorizes extensive logging activity annually over ten years or more, and allows that activity in LSR. AR 2601; AR 2560.

BLM and Intervenors commit the very error BLM wrongly accuses ASA of making: they limit their discussion of "context" to land area. BLM Mem. at 45; Intervenor Mem. at 32. As ASA argued, "context" is more than geography; it includes "affected interests." 40 C.F.R. § 1508.27(a); ASA Mem. at 31. Courts have recognized that a proposal's "geographic size <u>and</u> effects on large trees" and its nature as a "permanent change to [a] standard" were relevant when considering context, as were a project's "natural setting, its variegated non-human inhabitants, and its pure but fragile air quality." *Greater Hells Canyon Council v. Wilkes*, 2023 WL 6443823 at *11 (Aug. 21, 2023 D. Oregon) (emphasis added); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d, 722, 731 (9th Cir. 2001) (abr. on other grounds by *Monsanto Co., et al. v. Geertson Seed Farms, et al.*, 561 U.S. 139 (2010)). This Court has observed that a proposal's significant context prompted extensive critical public comments, legal challenges from multiple environmental NGOs,

intervention on the side of defendants by multiple NGOs, and a large public presence during oral argument. *Greater Hells Canyon Council* at *11. While oral argument is forthcoming, the other circumstances are present in these consolidated cases. The IVM-RL Program's context demands preparation of an EIS, and the intensity factors should be considered in light of this context.

      2.   <u>The intensity factors mandate preparation of an EIS.</u>

If substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor, the agency must prepare an EIS—it is not optional. *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005) ("[A]n EIS *must* be prepared if 'substantial questions are raised as to whether a project…*may* cause significant degradation of some human environmental factor.'") (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)) (emphasis in original). The Ninth Circuit and this Court have recognized that the presence of one intensity factor alone may be sufficient to require preparation of an EIS. *Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005); *Greater Hells Canyon v. Wilkes*, 2023 WL 6443823 (D. Or. 2023).

      a.   The IVM Program is highly controversial.

If a project's effects are "likely to be highly controversial," the agency should prepare an EIS. 40 C.F.R. 1508.27(b)(4); *see, e.g., Bark v. U.S. Forest Service*, 958 F.3d 865, 870 (9th Cir. 2020)). A project is "highly controversial" if a substantial dispute exists about the "size, nature, or effect" of the proposed action. *Id.* (quoting *Native Ecosystems Council*, 428 F.3d at 1240). NEPA requires agencies to consider all important aspects of a problem, W*ildEarth Guardians*, 759 F.3d at 1069-70, and a substantial dispute exists when evidence "casts serious doubt upon the reasonableness of an agency's conclusions." *Bark*, 958 F.3d at 870 (quoting *In Def. of Animals*, 751 F.3d at 1069). Where the agency's effects analysis "did not engage with the considerable

contrary scientific and expert opinion" and "instead drew general conclusions[,]" the Ninth Circuit has required the agency to prepare an EIS. *Bark*, 958 F.3d at 871.

BLM defends its decision to issue a FONSI and EA for the IVM-RL Program by citing a case in which the agency actually prepared an EIS. BLM Mem. at 56. A lengthy EA does not replace an EIS, and in fact, "in most cases…a lengthy EA indicates an EIS is needed." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026-01, 18037 (March 23, 1981). Instead, here, BLM claims that the authorized treatments "have already been addressed" in the PRMP/FEIS, while simultaneously asserting that the IVM-RL EA adequately analyzed the potential effect of "all future vegetation management projects" under the IVM-RL Program. BLM Mem. at 56, 42. By pointing back to the PRMP/FEIS to support its conclusory statements over-emphasizing any claimed beneficial impacts of the IVM-RL Program, BLM hopes to conceal existing controversy over the Program's disputed effects. ASA does not seek to engage BLM in a "battle of the experts," but instead highlights the dispute about effects to raise a substantial question as to whether the IVM-RL Program "may cause significant degradation of some human environmental factor." *Bark*, 958 F.3d at 870-71. Because controversy over the Program's effects exists, this factor is met.

As previously discussed, one area of considerable controversy is the extent to which the IVM-RL Program's reliance on commercial logging is an effective method of fire resilience. ASA Mem. at 34-35; KS Wildlands Mem. at 30-36. Much of the commercial logging authorized by the IVM-RL Program will occur in LSRs. AR 2612. ASA raised concerns about heavy commercial logging and group selection logging repeatedly in multiple sets of comments, noting that "prescriptions proposed in the IVM and Late Mungers Projects are extremely similar to those currently proposed in the Harvest Land Base. They include heavy commercial thinning and group

selection logging with similar project design features and prescription parameters." AR 1966. ASA specifically noted previous BLM analyses for recent timber sales—including the Clean Slate Timber Sale, discussed *supra*—where the agency identified "group selection logging, the heavy canopy removal it creates and artificial reforestation as the major mechanisms by which fuel loading is increased and fire resistance is reduced through management activity." *Id*. ASA quoted BLM's own analysis for the Clean Slate and Griffin Halfmoon Timber Sales to highlight the controversy around use of commercial harvesting methods like those in IVM:

> For the first one to five years after harvest, these stands would remain a slash fuel type until the shrubs, grasses, and planted trees become established. After establishment of regeneration, these stands would move into a brush fuel type. Brush fuel types are more volatile and are susceptible to high rates of fire-caused mortality. Stands could exhibit higher flame lengths, rates of spread, and fire intensity during this time. Fires started within these stands could be difficult to initially attack and control.

AR 41724 (ASA comment, quoting EAs for both projects). ASA offered many pages of additional literature review and studies in support of its comments on efficacy of commercial logging as a management approach, and expressly noted the "scientific disagreements about the ecological value of commercial thinning." AR 41723; s*ee also* AR 1966-76, AR 39064-65.

BLM failed to seriously engage with this information. Instead, it dismisses some studies and claims to have addressed others. BLM Mem. 61-65. And, once again, to hedge against the Court's possible agreement with Plaintiffs that effects of commercial thinning could be highly controversial, BLM directs attention back to the PRMP/FEIS. Waiving off opposing studies and redirecting attention does not explain why BLM ignored a substantial body of countervailing science about logging as a fire resilience tool (including its very own statements in other EAs). The effects of the IVM-RL are highly controversial, and BLM should prepare an EIS.

      b.  The effects of the IVM Program are highly uncertain.

The very "purpose of an EIS is to obviate the need for speculation" like that involved in the IVM-RL Program. *See Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 870 (9th Cir. 2005) (quoting *Nat'l Parks Association v. Babbitt*, 241 F.3d 722, 732 (9th Cir. 2001)). Where uncertainty may be resolved by further collection of data or where the collection of such data may prevent speculation, "[p]reparation of an EIS is mandated[.]"

In an effort to defend its tri-level programmatic planning effort, BLM cites a Ninth Circuit case for the proposition that a programmatic analysis also may serve as the basis for site-specific actions. BLM Mem. at 49-50 (citing N*orthern Alaska Environmental Center v. U.S. Dept. of Interior*, 983 F.3d 1077, 1085 (9th Cir. 2020)). In the cited section of the opinion, the Ninth Circuit discussed three other cases involving programmatic planning under NEPA; in all three cases, the agency involved had actually prepared a program-level EIS—not an EA. *Id.* (discussing *California v. Block*, 690 F.2d 753 (9th Cir. 1982), *Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003), and *Kempthorne*, 457 F.3d at 973-97)). Here, the only EIS at any level of planning is the PRMP/FEIS. The planning structure for the IVM-RL Program thus differs from those in the cases discussed in *NAEC*: at the level of project implementation, BLM proposes to rely on Determinations of NEPA Adequacy (not NEPA documents) which tier to the IVM-RL EA (not an EIS), which tiers to the 2016 RMP. AR 2600 (describing use of DNAs). Although the BLM stresses that it "may choose to conduct additional NEPA analysis," BLM Mem. at 50, tellingly, BLM has issued three DNAs without conducting additional site-specific NEPA review. *See* KS Wildlands Mem. at 7 n.7 (two other DNAs implementing IVM-RL Program do not involve logging). Tiering cannot excuse an agency from preparing an EIS if a project may have a significant effect on the environment; indeed, "[n]othing in the tiering regulations suggests that the existence of a programmatic EIS [for a planning document] obviates the need for any future

project-specific EIS, without regard to the nature or magnitude of a project." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

The built-in flexibility BLM affords itself with its multi-tiered structure also extends to the Program's potential timeframe. In its Cross-Motion, BLM acknowledges that the EA's analysis was for a "period of about 10-years[,]" BLM Mem. at 55; AR 2601. But BLM avoids engaging with the EA's express statements that the ten year time frame was "[f]or analytical purposes only" and that "the EA does not have a specific 'sunset' date after which the BLM will no longer use it." AR 2601. This means, technically, that BLM could still seek to apply the treatments authorized by the IVM-RL Program many years—or decades—into the future. BLM suggests that ASA should offer an alternative temporal limit, BLM Mem. at 55, but this suggestion improperly shifts the agency's burden to ASA.[3] ASA raised the absence of a temporal limit to show that fuller review of the IVM-RL Program's effects is needed if the Program has the potential to extend indefinitely. *Environmental Defense Center v. BOEM*, 36 F.4th 850, 881 (9th Cir. 2022). In *BOEM*, the Ninth Circuit agreed that the plaintiffs pointed to a lack of toxicity data not to suggest that the agencies test every chemical against every marine species, but to show that unknown risks posed by these chemicals warranted preparation of an EIS and reliance on an EA was inadequate. *Id*. So too, here, "an EA can never substitute for the preparation of an EIS, if the proposed action could significantly affect the environment." *Id*. (citing *Anderson*, 314 F.3d at 1023).

---

[3] BLM cites *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 962 (9th Cir. 2003), for the proposition that NEPA imposes no requirement that an agency analyze impacts for a particular length of time. BLM Mem. At 55. In *Selkirk*, although the court agreed that the three-year study was "not unreasonable," it took comfort in the fact that a multi-party Conservation Agreement between the agencies and the lumber company Stimson required analysis of new information and found "enforcement of this provision [of the Agreement] is particularly vital in light of the less-than-ideal three-year period of analysis in the EIS." *Selkirk*, 336 F.3d at 963.

Within the three-tiered structure of the IVM-RL Program, BLM's modeling for landscape successional patterns and fire resilience also contributes to the high degree of uncertainty of its effects. As discussed *supra* at Section I.B, the PRMP/FEIS and IVM-RL EA concluded that topography and soil type are essential to understanding landscape successional patterns and fire resilience. AR 02618; AR 02620. The IVM-RL EA recognized that "[t]he slope is variable across the Treatment Area[.]" *Id*. Strangely, BLM then applied a model that examined fire behavior according to a mean slope of 50 percent and that did not account for soils. AR 02770. The actual site-specific effects of the IVM-RL Program's treatments are thus uncertain, given the generalizations and assumptions built into BLM's modeling. Conducting an EIS would ensure that "available data are gathered and analyzed prior to the implementation of the proposed action." *Sierra Club v. U.S. Forest Service*, 843 F.2d 1190, 1195 (9th Cir. 1988) (citing *Foundation for North American Wild Sheep v. U.S. Dept. of Agr.*, 681 F.2d 1172, 1179 (9th Cir. 1982)).

Taken together, the multi-layered tiering of the IVM-RL EA to both the PRMP/FEIS and to some undetermined number of future DNAs, the absence of a clear end date to the IVM-RL Program, and modeling that doesn't provide the specificity that BLM itself concludes is necessary render the effects of the IVM-RL Program highly uncertain.

    c.   The IVM Program's likely adverse effects on endangered and threatened species require preparation of an EIS.

The Ninth Circuit has held that a finding of adverse effects on endangered and threatened species is "*prima facie* evidence that an EIS should have been prepared." *Environmental Defense Ctr. v. Bureau of Ocean Energy Management*, 36 F.4th 850, 879 (finding as "readily met" the significance factor concerning whether the action may adversely affect an endangered or threatened species). To trigger this intensity factor, "[a] project need not jeopardize the continued

existence of a threatened or endangered species[.]" *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1282 (D. Or. 2013); *see also Or. Wild v. Bureau of Land Management*, 2015 WL 1190131, *9-10 (D. Or. Mar. 14, 2015) (action proposing to remove less than 190 acres of critical NSO habitat within three overlapping spotted owl home ranges with "no nests or projected taking of NSO" still found to be significant and support preparation of an EIS). Rather, the likelihood of adverse effects is sufficient. *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F.Supp.2d 1069, 1080-81 (E.D. Cal. 2004) (FWS "likely to adversely affect" finding "is an important factor supporting the need for an EIS").

BLM and FWS agree with ASA and KS Wildlands that the IVM-RL Program is likely to adversely affect threatened and endangered species; specifically, the coastal marten and Northern Spotted Owl. BLM Mem. at 70 (citing agency findings in Biological Assessment, AR 13980, and Biological Opinion, AR 12459, 12471); ASA Motion at 39; KS Wildlands Motion at 37 n.29). This agreement, based on BLM's own conclusions, should render this factor "readily met" and compel preparation of an EIS. *See BOEM*, 36 F.4th 879.

In support of its claim that the IVM-RL Program will not adversely affect the threatened coastal marten, BLM points to a case evaluating a challenged project that involved logging in area designated as "critical habitat" for the NSO. BLM Mem. At 70 (discussing *Environmental Protection Information Center v. U.S. Forest Service*, 451 F.3d 1005 (9th Cir. 2006). Relying on *EPIC*, BLM emphasizes that NEPA requires consideration of the "degree of adverse effect on a species" as opposed to individuals of the species, claiming that the coastal marten won't experience adverse effects to a sufficiently large degree. BLM Mem. at 70; *EPIC*, 451 F.3d at 1010.[4] But

---

[4] *EPIC*, in turn, cites favorably to *Native Ecosystems Council*, 428 F.3d at 1240. *NEC* involved a challenge to a Forest Service project that would affect northern goshawk. But unlike

BLM's position, reflected in the EA, does not align with the evidence in the record. FWS concluded that both "short and long term impacts" to coastal marten habitat could be expected to result from IVM-RL, that there would be impacts at the stand level, and that the IVM-RL Program's treatments on coastal marten habitat would result in incidental take of 15 coastal marten. AR 13977, AR 13980, AR 12341, AR 12474.

In October 2020, the Coastal Distinct Population Segment of the Pacific marten, referred to as coastal marten, was listed as threatened. AR 12386. The BiOp noted that the coastal marten "has been nearly extirpated over much of its historic range" and "exists in four small populations." *Id*. This population decline is attributed to two main causes: habitat loss and decrease in connectivity between populations. *Id*. The recent listing of the coastal marten means that, at the time the IVM-RL EA was finalized, there was no final rule designating critical habitat for the coastal marten, nor had a recovery plan been developed. *Id*. FWS cautioned against "fragmenting existing suitable habitat" through road construction or activities that would encourage populations of other carnivores. AR 12391. The BiOp noted that "proposed critical habitat for the coastal marten will be conferenced on prior to implementation." AR 12407. FWS also stated

> With small populations of coastal marten, lack of connectivity between populations, and a paucity of information measuring the effects to marten populations from forest resiliency efforts similar to this program of work, it is possible that negative impacts to populations of less than 100 individuals (as reflected in each EPA) could be influential to the overall conservation of the species.

---

the coastal marten and NSO, the northern goshawk was not listed as threatened or endangered. The court's discussion of adverse effects on the goshawk vis a vis the plaintiff's NEPA claims arose under an analysis of "highly uncertain" or "highly controversial" impacts and cumulative effects. *Id*. at 1240-44. The remainder of the goshawk discussion centered around viability claims under the National Forest Management Act. *Id*. at 1249.

AR 12462.[5]

In sum, the degree of adverse effects to endangered or threatened species like the coastal marten is significant, and BLM should prepare an EIS.

> d. BLM ignores the unique geographic characteristics of the area, which support the need for an EIS.

An impact may be "intens[e] or "sever[e]" where the geographic area reflects unique characteristics, such as "*proximity to* historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. 1508.27(b)(3) (emphasis added). BLM believes that because it has excluded certain areas from the treatment area, no lands with unique character will be affected. BLM Mem. At 71. This argument misses the mark on the law and the facts. Even if some lands with protected status or specific designations are not directly a part of the treatment area, the regulation requires consideration of the "proximity" of the treatment area to the enumerated categories. *Id*. "Proximity" should not be ignored, especially where habitat connectivity is essential for maintenance and recover of animal species like the NSO, Pacific fisher, red tree vole, and coastal marten. AR 19056 (ASA comments raising issue of connectivity). In addition to LSR forests, oak woodlands and chaparral habitats support special status species in southwestern Oregon; these "ecologically critical areas" are likely to be impacted by the IVM-RL Program's treatments. AR 19057; 40 C.F.R. 1508.27(b)(3).

Further, BLM discounts the overall uniqueness and significance of the region. The Klamath-Siskiyou ecoregion has been described by scholars as an "area of global botanical significance" and a "centre of plant diversity." Dominick A. DellaSala, Stewart B. Reid, Terrence

---

[5] The degree to which NSO will be adversely affected is discussed throughout Plaintiffs' opening briefs. *See, e.g.* KS Wildlands' Mem. at 14, 37, 43. Adverse effects on NSO also support the preparation of an EIS.

J. Frest, James R. Strittholt & David M. Olson, *A Global Perspective on the Biodiveristy of the Klamath-Siskiyou Ecoregion*, 19 NAT. AREAS J. 300, 300–02 (1999). ASA previously discussed the ecological and cultural importance of the region in its comments and in its opening brief. Thus, the unique geographic characteristics of the region must be accounted for in an EIS.

       e.   The IVM-RL Program threatens a violation of FLPMA.

BLM and Intervenors' arguments that the IVM-RL Program does not violate FLPMA are unavailing. BLM Mem., Section I; Intervenors' Mem. Section V.A. ASA refutes those arguments in Section III, *infra,* and Section I.A, *supra*. Accordingly, an EIS is required.

III.     **BLM's approval of the IVM-RL Program and Late Mungers Project violated FLPMA.**

As structured, the IVM-RL Program would allow BLM to log first and consider recreation later. FLPMA (and NEPA) preclude this approach. BLM conducted no special management, as required by the RMP, has yet to define potential recreational uses in the Late Mungers ERMA, and deliberately chose to "not consider in detail" the IVM-RL Program's effects on recreation. *See* discussion *supra* at Section I.A.

In an effort to obfuscate the gaps in the EA's analysis, BLM faults ASA for not specifically identifying something that does not exist. Ironically, what is unspecified in the EA analysis is the BLM environmental impacts, its site-specific impact on RMAs, its impact on the recreation resources within RMAs, and/or the compatibility of the proposed logging with RMA frameworks.

The 2016 RMP sets forth management directions for recreation and visitor services, *inter alia*, "[p]rotect recreation setting characteristics within Special Recreation Management Areas to prohibit activities that would degrade identifies characteristic" and "[p]ursue and prioritize public

access to BLM-administered lands that have high recreational potential consistent with BLM designations and allocations." AR 48523. In Appendix G, the 2016 RMP provides a definition of SRMAs and ERMAs:

> **"Special Recreation Management Areas** (SRMAs) are administrative units where the existing or proposed recreation opportunities and recreation setting characteristics are recognized for their unique value, importance, and/or distinctiveness, especially as compared to other areas used for recreation. The BLM manages SRMAs to protect and enhance a targeted set of activities, experiences, benefits, and desired recreation setting characteristics. Within SRMAs, recreation and visitor services management is recognized as the predominant land use plan focus, where specific recreation opportunities and recreation setting characteristics are managed and protected on a long-term basis. **Extensive Recreation Management Areas** (ERMAs) are administrative units that require specific management consideration in order to address recreation use, demand, or recreation and visitor services program investments. The BLM manages ERMAs to support and sustain the principal recreation activities and the associated qualities and conditions of the ERMA. Management of ERMAs is commensurate with the management of other resources and resource uses. **Recreation Management Zones** (RMZs) are subdivisions of SRMAs or ERMAs identified in the Recreation Management Area (RMA) Frameworks that further delineate specific recreation opportunities or to ensure recreation and visitor services are managed commensurate with the management of other resources and resource uses.

Appendix G – AR 48375.

The 2016 RMP provides for recreation as the "predominant land use plan focus" in SRMAs, yet the IVM-RL planning area fails to prioritize recreation as the predominant land use plan focus in the numerous SRMAs within the Medford District.

BLM is correct that ASA did not challenge the selection of BLM's analytical framework, but ASA does challenge the BLM's lack of meaningful and accurate application of that framework. BLM Mem. at 25 n.6. ASA discussed ROS classes above in Section I.A., but reiterates here that the IVM-RL EA only made general statements about the theoretical effects of management directives on some ROS classes. AR 2853. Those statements do not sufficiently demonstrate

32

consistency with the Mungers Butte ERMA, nor do they provide assurances that SRMAs and ERMAs would not experience a change in characteristics.

According to BLM, 19,145 acres of backcountry ROS would be within the IVM Treatment Area. AR 2852. The level of human modification in these areas is identified as "Naturally appearing landscape having modifications not readily noticeable" and "Mature single or Multi layered canopy." Yet proposed commercial treatments would impact the naturally appearing landscape by creating group selection "openings," reducing mature and old forest canopies, removing mature trees, and eliminating multi layered canopy structure in many IVM treatment areas. This would shift or downgrade the area to a more developed Middle Country ROS. The level of human modification in Middle Country ROS identifies the area as "Natural-appearing landscape having modifications that do not overpower natural features." Yet the distinction between landscapes with modifications that are "not readily noticeable" as compared to those "that do not overpower natural features" is completely unaddressed.

This is especially important considering the group selection and heavy canopy reduction that is proposed in the IVM (to 30% canopy cover and up to 25% openings). These treatments, including Ecosystem Resilience Open and Fuel Emphasis Treatments, will shift the setting from human modifications that are not readily noticeable to overpowering on both the stand and viewshed/landscape scale. Finally, the structural stage proxies used to identify ROS classification do not apply to large portions of the landscape, including oak woodland and chaparral which can be heavily modified by IVM related non-commercial thinning treatments.

All of this information could have helped BLM ensure that it was fulfilling its obligation to ensure that the IVM-RL Program and Late Mungers Project are consistent with the Mungers Butte framework. BLM expects ASA to do the impossible and point to some missing analysis. Yet

ASA cannot create out of whole cloth an analysis of "naturalness" or "remoteness" that was not conducted. BLM directs the court's attention to the RMP's discussion of recreation settings characteristics because there is nowhere else to find this discussion: not in the IVM-RL EA, and not in the Late Mungers DNA. BLM should not receive deference to its interpretation of the RMP where it is not possible to discern compliance from the record. FLPMA requires more, and BLM should have specifically considered whether the IVM-RL Program was consistent with the Mungers Butte framework.

IV.   BLM's approach undermines public participation.

As far back as the scoping phase for the IVM-RL Program, ASA expressed concern about BLM's decision to rely on DNAs because they could enable BLM to bypass detailed site analysis, reduce public engagement, and decrease both the transparency and efficacy of land management. AR 39054; 39083. Upon release of the full Draft EA in August 2020, ASA again emphasized the importance that the public's right to meaningfully participate in federal land management planning should not be further limited or eliminated by Programmatic NEPA analysis. AR 19064.

One of NEPA's "twin aims" is to ensure that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process. *Balt. Gas and Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. at 97. Both the form and substance of the IVM-RL Program make it difficult for the public to be informed and to engage in the process. The IVM-RL Program's reliance on non-NEPA DNAs forecloses mandatory public engagement, and the upward and downward tiering leaves vague and conclusory content in the documents actually available for comment. ASA is invested in its community and wants to ensure that land planning is conducted in a transparent, reasonable way. The IVM-RL Program's structure impedes that goal.

**CONCLUSION**

For the reasons stated above, Plaintiff ASA respectfully requests that this Court deny

BLM and Intervenor-Defendants' Cross-Motions for Summary Judgment and grant ASA's

Motion for Summary Judgment.

Respectfully submitted this 23rd day of February, 2024.

s/ Sarah A. Matsumoto
Sarah A. Matsumoto
OSB # 111235
Alexandra Nielsen*
Nestor Rodriguez*
Adam Wolnski*
Sarah.Matsumoto@colorado.edu
University of Colorado Law School
Natural Resources, Energy, and Environmental Law Clinic
*Attorney for Plaintiff Applegate Siskiyou Alliance*

*LR 83-5 Eligible Law Students
